310 Ga. 231
FINAL COPY

S20A0986.  HENDERSON v. THE STATE.

BETHEL, Justice.

A Gwinnett County jury found Arion Henderson guilty of malice murder, felony murder, and aggravated assault in connection with the death of his grandfather, William Stridiron. Henderson contends that the State violated his constitutional right to a speedy trial and that his trial counsel provided constitutionally ineffective assistance in several regards. For the reasons set forth below, we affirm.[1]

---

[1] The crimes occurred sometime between January 9 and 13, 2012. On April 11, 2012, a Gwinnett County grand jury indicted Henderson for malice murder, felony murder predicated on aggravated assault, and aggravated assault. In a jury trial held from June 15 to 17, 2015, Henderson was found guilty on all counts. The trial court sentenced Henderson to life in prison without the possibility of parole on the malice murder count. The felony murder count was vacated by operation of law, and the aggravated assault count merged with the malice murder count.

On June 18, 2015, Henderson filed a motion for new trial through trial counsel. He later amended the motion twice through new counsel. After a hearing, the trial court denied the motion for new trial, as amended, on December 17, 2019. Henderson filed a notice of appeal on January 13, 2020. His case was docketed to this Court's April 2020 term and submitted for a decision on the briefs.

1. *The Jury Had Sufficient Evidence to Find Henderson Guilty.*

Viewed in the light most favorable to the jury's verdict, the evidence presented at trial showed the following. After an accident, Stridiron suffered nerve damage and a spinal injury that disabled him. In December 2011, after Henderson moved in with Stridiron, Stridiron expressed concerns to his caretaker that Henderson "had a lot of rage" and was disrespectful to him. Stridiron said that his physical condition would leave him unable to defend himself in an altercation with Henderson.

Later that month, an investigator responded to a domestic violence call at Stridiron's apartment. Henderson was present when the investigator arrived and said that he and Stridiron had argued. Visibly upset, Stridiron told the investigator that Henderson disrespected him by stealing his marijuana and that he wanted Henderson to leave the apartment. After the incident, Henderson gathered his belongings and agreed to move out of the apartment. After Henderson moved out, Stridiron suspected that Henderson was sneaking into his apartment to steal food, clothes, and other

items. In response, Stridiron installed new locks to prevent Henderson from accessing his apartment.

Stridiron's caretaker last saw him on Monday, January 9, 2012, and talked to him on the phone that evening after she left work. On Friday, January 13, after several unanswered calls to Stridiron, the caretaker called his apartment complex to request a welfare check. That same day, an apartment complex employee and a law enforcement officer conducted a welfare check at Stridiron's apartment. Because Stridiron had recently replaced the front door lock, the key did not work, so the employee crawled into the apartment through an unlocked window. In the apartment's back bedroom, the employee found Stridiron's body lying face down and covered with a blanket. Stridiron was dead. The officer testified that it appeared as though someone had poured bleach on Stridiron's clothing.

In the apartment's entryway, a large carpet piece was missing. The employee and officer noticed blood spatter on water bottles near the missing carpet area and red drag marks going from the entryway

3

toward the back bedroom where Stridiron's body was found.

The medical examiner testified that Stridiron had four stab wounds to his neck and shoulder that caused his death. A weapon with one sharp edge and one blunt edge inflicted the stab wounds. The state of Stridiron's body at his autopsy indicated that at least one day had passed between his death and his body's discovery.

Officers noted an oval-shaped dust print in the shape of a television on the surface of the bedroom dresser, but there was no television in the room. Officers also found a broken six-inch steak knife blade with a missing handle in the bedroom.

Henderson spoke with officers at Stridiron's apartment. He told them that he had clothes at his friend's apartment, which was located in the building across the parking lot from Stridiron's apartment building. Henderson took the officers to the friend's apartment, pulled a suitcase from the patio closet filled with clean clothes that still had their original tags, and told the officers they could go through the suitcase. Henderson told the officers that the clothes belonged to Stridiron.

Henderson told an officer that he had an alibi for January 9 and 10 because he was staying with Anthony Miller. Henderson then gave the officer an incorrect phone number for Miller. When the officer went to Miller's apartment to speak with him, the officer saw Henderson leaving the same apartment. Miller agreed to speak with the officer and got into the officer's car. While Miller and the officer were speaking, Henderson appeared antsy, walking back and forth, moving in and out of Miller's apartment.

At trial, Miller testified that, at the time he spoke to law enforcement in January 2012, he had just met Henderson in the neighborhood through his cousin. Miller met Henderson the week before Stridiron's death on January 4, hung out with him on January 5, and did not see him at all on January 6. Contrary to Henderson's claims, Henderson did not stay with Miller on January 9 or 10, which were the Monday and Tuesday during the week of Stridiron's death. On January 11, Henderson told Miller that he had an argument with Stridiron and pushed him and that Stridiron had hit his head and stopped moving. On January 12, Henderson left

5

Miller's apartment in the early morning and went back to Stridiron's apartment. Miller also bought a $150 television from Henderson, which Henderson claimed belonged to him.

On January 12, after Henderson visited Stridiron's apartment, Miller and Henderson rode around in Stridiron's van. Miller drove the van and picked up some friends who stayed at his apartment. Miller and Henderson parked the van in front of Stridiron's apartment. On the morning of Friday, January 13, Miller and Henderson noticed crime scene tape around Stridiron's apartment building. Henderson went to check on Stridiron, and Miller returned to his apartment. When Henderson came back to Miller's apartment, he told Miller not to say anything about the television to law enforcement and to hide the television in the closet. Officers arrived at Miller's apartment about ten minutes later.

In Miller's apartment, officers found a television covered with a blanket. The television's size matched the size of the dust print on Stridiron's bedroom dresser. Henderson told officers that he last saw Stridiron in December, when the police responded to their argument

about Stridiron's marijuana.

Officers searched the dumpster outside Stridiron's apartment complex and found the following items: the same type of trash bags and latex gloves as those in Stridiron's apartment; knives similar to the knife blade found in the apartment; a bloody knife handle wrapped in a paper towel and white tape; and one double-bound trash bag that contained a bloodstained carpet piece that matched the carpet from Stridiron's apartment.

Despite Henderson's claim that he had not been in Stridiron's van or apartment since he moved out a month earlier, officers found Henderson's "fresh" fingerprints on the GPS screen and exterior mirror of Stridiron's van, and a "fresh" palm print on a Chinese takeout menu in Stridiron's trash. They also found Henderson's fingerprints on the television in Miller's apartment. However, officers were unable to locate Stridiron's cell phone, wallet, and car keys during the investigation. The State also presented evidence suggesting that Henderson had withdrawn money from Stridiron's

bank account during the week of his death.[2]

DNA testing revealed that Stridiron and Henderson's DNA profiles were on the knife's handle and that Stridiron's DNA was on the knife's blade. The volume of epithelial skin cells found on the knife's handle matching Henderson was sufficient for the crime lab to secure a full DNA profile. An expert in forensic serology testified that this indicated that Henderson must have had more than casual or brief contact with the knife handle. The expert testified that, to have Henderson's full DNA profile on the handle, he must have held the handle for "quite a bit."

---

[2] After reviewing Stridiron's bank account activity, officers noted three suspicious transactions on January 9 and January 10, during the week of Stridiron's death. In each of those transactions, approximately $300 was withdrawn from Stridiron's checking account. Bank records also showed that an additional $500 in withdrawals were attempted from Stridiron's account. Those attempted withdrawals were declined due to insufficient funds. These were the last transactions listed from Stridiron's accounts. All six transactions occurred at an ATM located near Stridiron's apartment. The State introduced surveillance video recordings from that location for January 9, 10, and 11. In the videos, a man resembling Henderson, not Stridiron, is seen using the ATM three times, once each day. He successfully withdrew cash at least once and was denied at least once for insufficient funds. The person in the video wore the same jacket or vest on January 9, 10, and 11. Investigators found the same jacket type in Stridiron's hall closet.

Henderson does not challenge the legal sufficiency of the evidence supporting his conviction for malice murder, the only crime of which he was convicted. Nevertheless, it is our customary practice in murder cases to review the record independently to determine whether the evidence was legally sufficient with regard to the offenses of which the appellant was convicted.[3] Having done so, we conclude that the evidence presented at trial and summarized above was sufficient to authorize a rational trier of fact to find Henderson guilty of malice murder. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2. *The State Did Not Violate Henderson's Right to a Speedy Trial.*

Henderson contends that his constitutional right to a speedy trial was denied. We disagree.

The United States Constitution guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy

---

[3] We remind litigants that the Court will end its practice of considering sufficiency sua sponte in non-death penalty cases with cases docketed to the term of court that begins in December 2020. See *Davenport v. State*, 309 Ga. 385, 392 (4) (846 SE2d 83) (2020). The Court began assigning cases to the December term on August 3, 2020.

and public trial," U.S. Const. Amend. VI. Likewise, the Georgia Constitution protects this same right "[i]n criminal cases, the defendant shall have a public and speedy trial[.]" Ga. Const. of 1983, Art. I, Sec. I, Par. XI (a).

In ruling on a defendant's constitutional speedy trial claim, the analysis proceeds in two stages. A trial court's threshold inquiry is "whether the interval from the accused's arrest, indictment, or other formal accusation to the trial is sufficiently long to be considered presumptively prejudicial." (Citation and punctuation omitted.) *Ruffin v. State*, 284 Ga. 52, 55 (663 SE2d 189) (2008). If not, the speedy trial claim fails at this threshold. See id.

However, if the delay is deemed presumptively prejudicial, the trial court must consider the United States Supreme Court's four *Barker-Doggett* factors, which guide Georgia courts in considering whether a delay violated an accused's right to a speedy trial. See *Barker v. Wingo*, 407 U. S. 514, 530 (92 SCt 2182, 33 LE2d 101) (1972); *Doggett v. United States*, 505 U. S. 647, 652 (112 SCt 2686, 120 LE2d 520) (1992); see also *Redd v. State*, 261 Ga. 300, 301 n.1

(404 SE2d 264) (1991) (applying the *Barker-Doggett* factors to speedy trial claims under the Georgia Constitution).

As we have explained,

> [i]f the delay is long enough to invoke the presumption of prejudice, the trial court must balance four factors: (1) whether the delay before trial was uncommonly long, (2) whether the government or the criminal defendant is more to blame for the delay, (3) whether, in due course, the defendant asserted his right to a speedy trial, and (4) whether he suffered prejudice as the delay's result.

(Citations omitted.) *Cash v. State*, 307 Ga. 510, 513 (2) (a) (837 SE2d 280) (2019).

Speedytrial claims require trial courts "to engage in a difficult and sensitive balancing process." *Ruffin*, 284 Ga. at 56 (2) (quoting *Barker*, 407 U. S. at 533). This task is committed principally to the discretion of the trial court, and this Court has a "limited" role in reviewing the trial court's decision. *State v. Buckner*, 292 Ga. 390, 391 (738 SE2d 65) (2013).

> [W]e must accept the factual findings of the trial court unless they are clearly erroneous, and we must accept the ultimate conclusion of the trial court unless it amounts to an abuse of discretion, even though we might have reached a different conclusion were the issue committed to our discretion.

11

*Buckner*, 292 Ga. at 391.

(a) *Length of Delay*. The right to a speedy trial attaches at the time of arrest or formal accusation or indictment, whichever occurs first, and courts measure the delay from the time the right attaches. See *Scandrett v. State*, 279 Ga. 632, 633 (1) (a) (619 SE2d 603) (2005). That time then runs until the date on which the defendant's trial begins. See *Christian v. State*, 281 Ga. 474, 476 (2) (640 SE2d 21) (2007). The delay in this case, calculated from Henderson's arrest on January 13, 2012, until the first day of his trial on June 15, 2015, was just over three-and-a-half years. As the trial court found and the State concedes, this delay was "presumptively prejudicial," and the trial court was correct to weigh the length of the delay against the State. See *Goins v. State*, 306 Ga. 55, 57 (2) (b) (829 SE2d 89) (2019) ("A one-year delay is typically presumed to be prejudicial.").

(b) *Reasons for the Delay*. The trial court attributed the delays in this case to both the State and Henderson. It did not abuse its

discretion in doing so.

> Whether the defendant or the State bears the primary responsibility for delay in reaching trial is pivotal in evaluating the strength of a constitutional speedy trial claim, as it can color the consideration of all other factors. Deliberate delay is weighed heavily against the State. Delay resulting from neutral causes, such as negligence, has lighter weight. Of course, delay caused by the defense weighs against the defendant.

(Citation and punctuation omitted.) *Burney v. State*, 309 Ga. 273, 287 (4) (b) (845 SE2d 625) (2020).

In this case, the trial court attributed the delay in bringing Henderson to trial both to the State's backlog of cases and to the actions of Henderson's trial counsel. The court found that the State's role in the delay was benign, noting that an overcrowded docket contributed to the delay. The court also noted that Henderson never alleged that the State intentionally delayed bringing him to trial to gain an advantage. The court also weighed the factor against Henderson benignly, noting that his trial counsel filed 11 leaves of absence, covering nearly 35% of the available trial dates from the date of the indictment to the time of Henderson's trial. Henderson's

13

trial counsel also requested two continuances, resulting in an additional four-to-five-month delay. See *Williams v. State*, 290 Ga. 24, 26 (2) (717 SE2d 640) (2011) ("[W]hen any portion of a delay in trial is caused by or at the behest of defense counsel, it should not be weighed against the State."). These findings were not clearly erroneous and support the trial court's determination that Henderson and the State both contributed to the delays.

Henderson also contends that the trial court should not have blamed him for any of the delay following his indictment, complaining that the court improperly cited his counsel's consent to a State-requested continuance for four to five months and attributed the delay's cause to Henderson. Henderson is correct that the State caused this specific delay by requesting the continuance. However, because Henderson consented to this continuance and its resulting delay, the trial court did not abuse its discretion by weighing the continuance lightly against the State.

(c) *Defendant's Assertion of the Right*. The trial court determined that Henderson invoked his statutory right to a speedy

trial roughly ten months after his indictment. The trial court noted that Henderson later filed an out-of-time demand for speedy trial. The record supports these findings.

In determining the weight to assign this assertion-of-the-right factor, courts should consider the "timing, form, and vigor of the accused's demands to be tried immediately." *Ruffin*, 284 Ga. at 63 (2). Henderson argues that the trial court improperly assessed his assertion's vigor and timing and should have weighed this factor more in his favor. Henderson asserts that the trial court improperly determined *when* he asserted this right by failing to consider Henderson's own pro se motions with the court and Henderson's private conversations with his counsel.

First, regarding Henderson's pro se motions, this argument has no merit. "A demand for speedy trial has no legal effect whatsoever if filed by a defendant acting pro se at a time he is represented by counsel." (Citation and punctuation omitted.) *Redford v. State*, 335 Ga. App. 682, 683 (782 SE2d 791) (2016); see also *Johnson v. State*, 300 Ga. 252, 254 (794 SE2d 60) (2016). A

15

defendant "does not have the right to represent himself and also be represented by an attorney." (Citation and punctuation omitted.) *White v. State*, 302 Ga. 315, 319 (806 SE2d 489) (2017). Any pro se filings by represented parties are "unauthorized" nullities that are "without effect." Id. Thus, because the trial court could not consider Henderson's pro se motions, we also do not consider them in assessing the trial court's determination of when and in what manner Henderson asserted his right to a speedy trial.

Second, Henderson also argues that the trial court failed to consider private conversations between him and his trial counsel where he asserted his right to a speedy trial to his counsel even before the indictment. This argument also lacks merit. To invoke this right to a speedy trial, the accused must assert it *to the court*. Privileged, off-the-record conversations cannot serve as a sufficient assertion of this right, as neither the trial court nor the State are put on notice of such privately made assertions until they are relayed through counsel. "[T]he accused bears some responsibility to invoke the speedy trial right and *put the government on notice* that

16

he or she, unlike so many other criminal defendants, would prefer to be tried as soon as possible." (Emphasis supplied.) *Ruffin*, 284 Ga. at 62 (2); see also *Dillard v. State*, 297 Ga. 756, 761 (4) (778 SE2d 184) (2015) ("While appellant was not required to seek a speedy trial at the first available opportunity, it was incumbent upon him to put the State on notice that he preferred to be tried as soon as possible.").

Lastly, we consider whether Henderson's demand for a speedy trial required greater weight than the trial court gave it. On October 31, 2012, Henderson, through counsel, filed an untimely statutory demand for speedy trial pursuant to OCGA § 17-7-171, which included an assertion of his constitutional right to a speedy trial. This statute requires that a statutory demand for a speedy trial be filed: either (1) within the term of court in which the indictment was returned, or (2) during the next succeeding regular term of court. See OCGA § 17-7-171. In this case, OCGA § 15-6-3 (20) provides that terms of court for Gwinnett County Superior Court begin on the first Monday in March, June, and December and the second Monday in September. The statute thus allowed Henderson to file his statutory

17

demand during the March 2012 term, which is the term in which he was indicted, or the June 2012 term, which was the next succeeding term. However, Henderson did not file his demand until the September 2012 term. Accordingly, Henderson's statutory demand for speedy trial failed to comply with these statutory requirements and was properly deemed "untimely" by the trial court. However, even though the statutory demand was untimely, the constitutional assertion that accompanied it was not, as a defendant may file an assertion based on his constitutional right to a speedy trial at any time after arrest. See *Dillard*, 297 Ga. at 761 (4).

On November 8, 2012, after realizing the statutory demand was untimely, Henderson, through counsel, filed an out-of-time speedy trial demand "without leave of court" asserting both his statutory and constitutional right to a speedy trial. Although the trial court found that the statutory speedy trial demand was untimely, the court concluded that for purposes of the *Barker-Doggett* balancing test, it would consider that Henderson did invoke his right to a speedy trial.

We agree that the filing of a speedy trial demand would typically weigh in a defendant's favor in determining when he asserted his constitutional right to a speedy trial. However, when assessing the weight to give the statutory demand, it was within the trial court's discretion to consider the assertions' "timing, form, and vigor[.]" *Ruffin*, 284 Ga. at 63 (2). Moreover, even though the constitutional assertion was timely, Henderson has relied in his arguments in the trial court and on appeal almost exclusively on the statutory demand. Given that Henderson's statutory speedy trial demand did not comply with the requirements of OCGA § 17-7-171 and his inattention to the constitutional assertion, as well as his delays in asserting his rights to a speedy trial, we hold that it was not an abuse of discretion for the trial court to weigh this factor neither for nor against Henderson.

(d) *Prejudice to the Defendant*. The trial court did not abuse its discretion when it determined that Henderson failed to establish prejudice arising out of the alleged violation of his right to a speedy trial. The prejudice associated with unreasonable delay before trial

includes "oppressive pretrial incarceration, anxiety and concern of the accused, and the possibility that the (accused's) defense will be impaired by dimming memories and loss of exculpatory evidence." (Citation and punctuation omitted.) *Doggett*, 505 U. S. at 654 (III) (A). "Of these forms of prejudice, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." (Citation and punctuation omitted.) Id.

Henderson argues that he suffered prejudice in two ways: by suffering from anxiety due to his pre-trial confinement, and by losing the ability to present an alibi defense. The trial court did not abuse its discretion by rejecting both contentions.

Henderson asserts that he experienced extreme anxiety and concern when his trial delay caused him to develop an overall distrust in the judicial system and a loss of his support system. However, as we have noted, "[a]nxiety and concern of the accused are always present to some extent, and thus absent some unusual showing are not likely to be determinative in defendant's favor."

(Citation and punctuation omitted.) *Mullinax v. State,* 273 Ga. 756, 759 (2) (545 SE2d 891) (2001). Because the trial court did not clearly err in finding that Henderson's anxiety was not unusual or extraordinary for a criminal defendant awaiting trial, we see no abuse of discretion in its determination that Henderson was not prejudiced in this regard.

Henderson also contends that the delays in bringing him to trial impaired his alibi defense because his ex-girlfriend, Shawnice Gibbs, broke up with him and did not testify at trial. Henderson claims her testimony would have established an alibi defense for him. Henderson does not explain how the termination of their relationship impaired Gibbs's ability to testify truthfully. Moreover, the trial court correctly noted that other than Henderson's own claims regarding Gibbs's potential testimony, Henderson did not provide any evidence that Gibbs's testimony at trial would have corroborated Henderson's story or that Henderson sought to contact her as a trial witness or secure her attendance at trial. See *Johnson v. State,* 268 Ga. 416, 418 (2) *(*490 SE2d 91) (1997) (no showing of

prejudice where the defendant speculated about possible exculpatory witnesses but presented no evidence that those witnesses would have testified or what their testimony might have shown). Contrary to Henderson's assertions, the trial court noted that, had Gibbs testified, her testimony likely would have hurt Henderson's alibi defense. For instance, despite Henderson claiming that Gibbs could provide his alibi, Gibbs told investigators that she had not been with Henderson at all during the week of the murder. Accordingly, we find no abuse of discretion in the trial court's determination that the delay in bringing Henderson to trial did not prejudice his ability to present an alibi defense involving Gibbs's testimony.

In sum, although the delays in this case were presumptively prejudicial, we cannot say that the trial court abused its discretion in applying the *Barker-Doggett* factors to determine that the other factors weighed neutrally against a determination that Henderson's constitutional right to a speedy trial was violated. Nor was there any clear error in the factual findings supporting those determinations.

This enumeration of error therefore fails.

3. *Henderson Did Not Receive Ineffective Assistance of Counsel.*

Henderson also contends that his trial counsel provided constitutionally ineffective assistance. We disagree.

To succeed on his claims, Henderson must show that his counsel's performance was professionally deficient and that he suffered prejudice as a result. See *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To establish deficient performance, Henderson must prove that his lawyer "performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms." *Thornton v. State*, 307 Ga. 121, 126 (3) (834 SE2d 814) (2019). "To establish prejudice, [Henderson] must prove that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different." Id. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Harrington v. Richter,* 562 U. S. 86, 104 (131 SCt 770, 178 LE2d 624) (2011) (quoting *Strickland,* 466 U.

S. at 693). Rather, Henderson must establish a "reasonable probability" of a different result, which means "a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U. S. at 694. Finally, "[i]f [Henderson] fails to meet either prong of the *Strickland* test, it is not incumbent upon this Court to examine the other prong." *Green v. State*, 291 Ga. 579, 580 (2) (731 SE2d 359) (2012).

(a) *Failing to File a Timely Statutory Demand for Speedy Trial.* Henderson first asserts that his trial counsel provided constitutionally ineffective assistance by failing to calculate court terms correctly for filing a timely statutory demand for a speedy trial under OCGA § 17-7-171. This claim lacks merit.

We have considered this issue before. With facts somewhat analogous to this case, in *Crawford v. Thompson*, 278 Ga. 517 (603 SE2d 259) (2004), this Court held that trial counsel performed deficiently by failing to comply with the strict requirements of

OCGA § 17-7-171 by citing the wrong statute.[4] We also held that trial counsel's error prejudiced the defendant in that the defendant could not exercise his right to a speedy trial. See *Crawford*, 278 Ga. at 520 n.3. However, that analysis was erroneous under *Strickland*, and for the reasons set forth below, we overrule *Crawford*'s prejudice analysis.

Under the doctrine of stare decisis, courts generally stand by their prior decisions, because doing so "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Duke v. State*, 306 Ga. 171, 183-184 (829 SE2d 348) (2019) (punctuation omitted) (citing *State v. Hudson*, 293 Ga. 656, 661 (748 SE2d 910) (2013)). "Stare decisis, however, is not an 'inexorable command.'" Id. at 184 (quoting

---

[4] We note that *Crawford* involved a claim of ineffective assistance of *appellate* counsel in which the defendant claimed that his appellate counsel was deficient in failing to enumerate as error a claim of ineffective assistance of *trial* counsel based on trial counsel's failure to file a proper demand for speedy trial under OCGA § 17-7-171. See *Crawford*, 278 Ga. at 520. Our consideration goes to the soundness of our ruling as to the underlying claim of ineffective assistance of *trial* counsel.

*Hudson*, 293 Ga. at 661). "'Courts, like individuals, but with more caution and deliberation, must sometimes reconsider what has been already carefully considered, and rectify their own mistakes.'" Id. (quoting *City of Atlanta v. First Presbyterian Church*, 86 Ga. 730, 733 (13 SE 252) (1891)). "In reconsidering our prior decisions, 'we must balance the importance of having the questions *decided* against the importance of having it decided *right*.'" (Emphasis in original.) Id. (quoting *State v. Jackson*, 287 Ga. 646, 658 (5) (697 SE2d 757) (2010)). "To that end, we have developed a test that considers 'the age of the precedent, the reliance interests at stake, the workability of the decisions, and most importantly, the soundness of its reasoning.'" (Emphasis omitted.) Id. (quoting *Jackson*, 287 Ga. at 658 (5)).

In *Crawford*, this Court held that trial counsel's failure to file a timely statutory speedy trial demand prejudiced the defendant under *Strickland*. We see several reasons to revisit *Crawford*'s prejudice analysis.

First, *Crawford* relied upon a speculative analysis to determine

26

that the defendant suffered prejudice. *Crawford* held that due to trial counsel's deficient performance, the defendant had failed to comply with the statutory speedy trial requirements. See *Crawford*, 278 Ga. at 518. The *Crawford* court noted that it would not "speculate" as to whether "the State would have tried [the defendant] had [his trial counsel] acted in strict statutory compliance" with the filing requirements. Id at 520 n.2. But our review of *Crawford* shows that the court did just that.

*Strickland* places a heavy burden on the defendant to "affirmatively prove" prejudice through evidence of a "reasonable probability" of a different result. *Pierce v. State,* 286 Ga. 194, 198 (686 SE2d 656) (2009). Our conclusion that the defendant in *Crawford* satisfied this burden was wrong as *Crawford* presumed prejudice based on deficiency. In *Crawford*, it is clear that the defendant did not demonstrate actual prejudice, which he could only do by showing that, had his counsel actually filed a proper statutory speedy trial demand, the State would not have been able to try him on time. See *Hughley v. State*, 355 Ga. App. 189, 195 (843 SE2d 622)

27

(2020) (defendant unable to show *Strickland* prejudice because he could not "prove whether he would have been tried earlier if his trial counsel had properly filed a speedy trial demand"); see also *Bigham v. State*, 296 Ga. 267, 271 (765 SE2d 917) (2014) ("[B]ecause a defendant can be re-indicted after the grant of a special demurrer, a failure to file such a demurrer generally will not support a finding of ineffective assistance of counsel." (citation and punctuation omitted)). Absent this affirmative showing of prejudice, the only argument the *Crawford* defendant provided was his speculative assertion that prejudice would have occurred. But as we have noted, "mere speculation on the defendant's part is insufficient to establish *Strickland* prejudice." *Pierce*, 286 Ga. at 198.

Second, we also held in *Crawford* that the defendant suffered prejudice, not because he was not discharged, but because he could not exercise his statutory right to a speedy trial. See *Crawford*, 278 Ga. at 520 n.3. That conclusion is also erroneous. If *Crawford* was correct, it would follow that any time a trial lawyer improperly filed a statutory speedy trial demand, the defendant would automatically

28

suffer *Strickland* prejudice and have a winning claim of ineffective assistance of counsel after being found guilty at trial. This is inconsistent with the *Strickland* prejudice analysis, which gauges the effect of a lawyer's error on the *outcome* of the proceedings. See *Strickland,* 466 U. S. at 694. We cannot categorize a delay in a proceeding as per se determinative of that proceeding's outcome.

We conclude that *Crawford*'s prejudice analysis was speculative, incorrect, and resulted in an incorrect holding. This significant unsoundness cuts "heavily in favor of overruling [*Crawford*]." *Olevik v. State*, 302 Ga. 228, 245 (2) (c) (iv) (806 SE2d 505) (2017). We turn to the other stare decisis factors to evaluate whether any of them alone or in combination weigh in favor of saving this incorrect decision.

As for the age of the decision, *Crawford* was decided 16 years ago, "and we have overruled decisions older than that." *Olevik*, 302 Ga. at 245 (2) (c) (iv). See also *Duke*, 306 Ga. 171 (overruling a case that had been decided 19 years previously). *Crawford* is "neither ancient nor entrenched" within our judicial system. (Citation and

punctuation omitted.) *Southall v. State*, 300 Ga. 462, 468 (1) (796 SE2d 261) (2017). Moreover, neither this Court nor the Court of Appeals has ever relied upon *Crawford*'s prejudice analysis regarding the untimely filing of a statutory demand for a speedy trial. With respect to reliance and workability, we see no reason to save the rule in *Crawford*. As discussed above, *Crawford* employs a test that presumed prejudice based on deficiency. A *Strickland* claim requires a showing of actual prejudice to the defendant flowing from counsel's defective performance. See *Keller v. State*, 308 Ga. 492, 496 (842 SE2d 22) (2020). *Crawford* deviates from this standard and lowers the burden that an appellant must satisfy in bringing a claim of constitutionally ineffective assistance.

Accordingly, we overrule *Crawford* to the extent it held that the untimely filing of a statutory speedy trial demand under OCGA § 17-7-171 always results in *Strickland* prejudice. This is not to say that failing to file a timely statutory speedy trial demand can never result in *Strickland* prejudice, but that is a case-by-case determination.

Having overruled *Crawford*, we must now determine whether the trial court erred by determining that Henderson did not suffer prejudice as the result of counsel's failure to file a timely statutory demand for speedy trial. Henderson claims that this failure to timely file a speedy trial demand and subsequent delay in his trial prejudiced him by contributing to his distrust in the judicial system and by losing contact with his ex-girlfriend, Gibbs. We disagree that Henderson has established prejudice under *Strickland* because he has not demonstrated a reasonable probability that had his counsel filed a proper speedy trial demand, his trial's *outcome* would have been different. See *Strickland,* 466 U. S. at 694.

As the trial court properly noted, filing a statutory speedy trial demand would not have automatically resulted in Henderson's acquittal as Henderson suggests, but would likely have sent Henderson to trial earlier and given his counsel less time to prepare a defense. In light of the overwhelming evidence against him, Henderson has not shown that holding his trial earlier would have resulted in a different outcome. He therefore has not satisfied his

burden of demonstrating that counsel's conduct caused him prejudice. Accordingly, this claim of ineffective assistance fails.

(b) *Failing to Reasonably Investigate Alibi Witnesses*. Henderson also contends that his trial counsel provided constitutionally ineffective assistance by failing to make a reasonable investigation of alibi witnesses that might have aided his case. We disagree.

Henderson claims that his trial counsel did not investigate his case or interview possible witnesses that could have provided an alibi, including Gibbs, Shaquille Clarke, and Thomas Tribble. Concerning the adequacy of investigations, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," and heavy deference is given to counsel's judgments. (Citation and punctuation omitted.) *Wiggins v. Smith*, 539 U. S. 510, 521-522 (II) (A) (123 SCt 2527, 156 LE2d 471) (2003). Here, the trial court properly found that Henderson's trial counsel moved for additional investigative funds, filed motions seeking discovery, and hired an investigator who

interviewed defense witnesses, photographed the crime scene, and subpoenaed phone records. Specifically, trial counsel testified at the motion for new trial hearing that she had advised the investigator to reach out to Gibbs, Clarke, and Tribble, but they could not be found or could not testify to a credible alibi defense on Henderson's behalf.

Henderson was required to offer more than "mere speculation" that Gibbs, Clarke, and Tribble would have bolstered his defense. See *Mangrum v. State*, 291 Ga. 529, 531 (731 SE2d 761) (2012). Henderson has failed to point this Court to any additional efforts that could have been made to gain information about the case from Gibbs, Clark, or Tribble or to any additional defense witnesses who might have been found through reasonable investigative efforts. Henderson has thus failed to demonstrate how his trial counsel performed deficiently with regard to her investigation of the case and possible defenses, and this claim of ineffective assistance fails.

(c) *Failing to Impeach Witness with Phone Records.* Henderson also claims that his counsel provided ineffective assistance by failing

33

to use phone records to impeach Anthony Miller, one of the State's witnesses. Miller testified that Henderson told him that he had an argument with Stridiron and pushed him and that Stridiron had hit his head and stopped moving. Miller also testified that Henderson left Miller's apartment early Thursday morning and went back to Stridiron's apartment and that Miller bought a television from Henderson.

On cross-examination, trial counsel asked Miller questions about a possible plea deal that he had entered into with the State in exchange for his testimony and about his prior felony conviction for possession of marijuana with the intent to distribute. Henderson now asserts that his counsel should have also utilized certain phone records during the cross-examination to contradict the information Miller testified to at trial concerning Henderson's whereabouts and activities during the week of Stridiron's death. At the hearing on his motion for new trial, Henderson's trial counsel testified that the phone records included calls from Miller to Henderson prior to the date that Miller testified they met as well as calls from Henderson

34

to Gibbs that contradicted Miller's timeline.[5]

However, when asked about her decision not to use the phone records to impeach Miller, trial counsel characterized her general impeachment strategy as "less is more." Trial counsel stated that she generally chooses not to "throw every little thing" at witnesses because it "dilutes the power" of the strongest impeachment evidence available to her. Trial counsel testified that, in this case, she chose to prioritize Miller's prior felony conviction over the phone records because she believed evidence of Miller's criminal history would be most helpful to Henderson's defense.

Given what little we know about the phone records, we cannot say that trial counsel's decision not to impeach Miller with the phone records was a patently unreasonable trial strategy. "Counsel's trial decisions are presumed to be strategic, and, absent some evidence to the contrary, an appellant fails to overcome the strong presumption that trial counsel's performance fell within the range of reasonable

---

[5] Neither party produced these phone records during Henderson's trial, or during the motion for new trial hearing, and they do not appear in the record before this Court.

professional conduct and was not deficient." *Smith v. State*, 300 Ga. 532, 536 (3) (b) (796 SE2d 671) (2017); see also *Romer v. State*, 293 Ga. 339, 344-345 (3) (a) (745 SE2d 637) (2013) (holding that, in light of other methods of impeaching State's witness used by trial counsel, failure to impeach on other specific grounds was a matter of trial strategy that did not constitute deficient performance). This claim of ineffective assistance fails.

*Judgment affirmed. All the Justices concur, except Warren, J., not participating.*

Decided October 19, 2020.

Murder. Gwinnett Superior Court. Before Judge Beyers.
*Lynn M. Kleinrock*, for appellant.
*Daniel J. Porter, District Attorney, Daniel Sanmiguel, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Leslie A. Coots, Assistant Attorney General*, for appellee.