S11A1909. PHAN v. THE STATE.

(723 SE2d 876)

HUNSTEIN, Chief Justice.

This murder case, in which the State seeks the death penalty, returns to us for a second pre-trial appeal in which we must address the consequences of a financially strained indigent defense system operating within a recession-era State budget. In *Phan v. State*, 287 Ga. 697 (699 SE2d 9) (2010) ("*Phan I*"), we vacated a prior trial court order and remanded the case for a more comprehensive analysis as to Appellant Khahn Dinh Phan's claim of a constitutional speedy trial violation, grounded in his assertion of a "systemic breakdown" in the public defender system. The trial court having complied with this directive, Phan now appeals the resulting order in which the trial court denied Phan's speedy trial claim and ordered the replacement of his appointed private attorneys with salaried counsel from the capital defender's division of the Georgia Public

Defender Standards Council ("GPDSC").[1] For the reasons set forth below, we conclude that the trial court properly denied Phan's motion to dismiss on speedy trial grounds and did not abuse its discretion in replacing Phan's counsel.

As set forth in *Phan I*,

> on December 29, 2004, Hung Thai and his two-year-old son were murdered "execution style" by gunshots to the back of the head. Hung's wife, Hoangoah Thai, was also shot in this manner, but she survived. After waking up from a seven-week coma, Hoangoah left for Vietnam, her family's native country. When interviewed by Georgia detectives over the telephone, Hoangoah identified Phan as the person responsible for the shootings.

Id. at 697-698. Phan was arrested in March 2005 and indicted in September 2005. In October 2005, the State filed its notice of intent to seek the death penalty. Attorney Christopher W. Adams, then the Director of the Office of the Georgia Capital Defender,[2] filed an entry of appearance on Phan's behalf in January 2006;[3] attorney Bruce Harvey, who was originally retained in the case prior to the filing of the death notice, has remained as Adams' co-counsel.[4] Phan's first Unified Appeal hearing was held in February 2006. The State produced its discovery materials in October 2006, and the defense filed more than 50 pre-trial motions in November 2006; that same month, the trial court entered an order removing the case from the trial calendar until all pre-trial motions had been heard and resolved.

In December 2007, defense counsel submitted a written request to the Capital Defender's Office for authorization of funds for the defense team — including both attorneys, a mitigation specialist, and a translator — to travel to Vietnam for investigation both as to guilt/innocence and mitigation. In January 2008, funds for the trip

---

[1] The GPDSC is the agency created under the 2003 Georgia Indigent Defense Act to oversee the provision of effective and uniform indigent defense on a statewide basis. See Ga. L. 2003, p. 191, § 1; OCGA §§ 17-12-1 to 17-12-13. The capital defender's division is responsible for providing indigent defense in death penalty cases in the State. OCGA § 17-12-12 (a).

[2] The Office of the Georgia Capital Defender was the predecessor to the capital defender division of the GPDSC. See OCGA § 17-12-12 (a). See also OCGA §§ 17-12-120 to 17-12-128 (repealed effective July 1, 2008, see Ga. L. 2008, p. 846, § 42).

[3] Though Adams subsequently left the Office of the Capital Defender to go into private practice, he arranged to continue his representation of Phan, as memorialized in a contract with the GPDSC entered into in February 2008, in which the GPDSC agreed to pay Adams up to a total of $100,500 for his services in the case.

[4] Though there appears to be no dispute that Harvey was retained as defense counsel by the GPDSC prior to issuance of the death notice, the record contains no written contract memorializing his engagement, and apparently Harvey has never sought or received any payment for his services in the case.

were approved in part, allowing for only one attorney to make the trip; this decision was apparently in accordance with a recently adopted GPDSC policy limiting funding for out-of-state mitigation travel to a single attorney per case. Believing that both attorneys were necessary to conduct a sufficient investigation in Vietnam, the defense deferred its travel plans and alerted the trial court to their problems in funding the trip.

In August 2008, the defense filed a motion[5] requesting that the trial court order the authorization of sufficient funds to cover travel for both attorneys, contending that denying the ability of both counsel to participate fully in the mitigation investigation would prevent them from providing constitutionally required effective representation in accordance with recognized standards for death penalty defense. At the August 29, 2008 hearing on this motion, the defense adduced testimony from the then-GPDSC Director to the effect that, due to the deteriorating State budget situation, there were at that time *no* funds available for *any* proposed travel for Phan's case. Noting the significance of the investigation in Vietnam to the defense strategy both in the guilt/innocence phase and at sentencing for mitigation purposes, the defense asked the trial court either to strike the death notice[6] or to continue the case indefinitely until sufficient funds were available. The court declined at that point to adopt either of these measures, but expressed concern at the funding problems and pledged to ensure a fair trial.

In April 2009, on the day before a long-scheduled motions hearing, the defense filed a constitutional speedy trial demand and a motion to dismiss for the State's failure to provide sufficient resources for the defense. At the outset of the hearing, defense counsel requested a continuance on the basis that the GPDSC had stopped paying their fees in the case. The defense presented testimony to the effect that the then-Director of the GPDSC, having received a recent State audit report indicating potential constitutional problems with the funding structure for GPDSC's arrangements with outside counsel, had suspended further payments for Phan's case and approximately ten other similarly situated cases. Further testimony revealed that the GPDSC had asked the legislature for a special

---

[5] This motion was originally filed ex parte, but it and the transcript of the hearing thereon, as well as subsequent ex parte filings and evidence regarding defense funding, have been unsealed by the trial court for use in this appeal.

[6] Striking the death notice, while not only reducing the significance of the Vietnam trip by eliminating the need for a mitigation investigation, would also, the defense argued, have eliminated the statutory impediment to requiring the county to assist in funding the defense. See *Ga. Public Defender Standards Council v. State*, 285 Ga. 169, 172-173 (675 SE2d 25) (2009) (Indigent Defense Act requires State, not county, to fund death penalty defense for indigents). See also OCGA §§ 17-12-12, 17-12-12.1.

appropriation to address the situation but had been unsuccessful. Thus, at that point in time, there was no funding available for any aspect of Phan's defense, nor was there any money appropriated for it in the budget for the following fiscal year, ending June 30, 2010. Arguing against dismissal, the District Attorney candidly conceded that Phan was not being afforded sufficient resources for his defense; nonetheless, the prosecution contended that dismissing the case and striking the death notice were not appropriate remedies and suggested that appellate guidance would ultimately be necessary to resolve the issues.

The trial court denied the defense's motions in a May 2009 order which also purported to certify the case for interlocutory or interim review. In its order, the trial court made various findings of fact regarding the progression of the case, concluding that the GPDSC was at that time unable to provide any further funds for the defense and that there was "[n]o end . . . in sight to this situation." The court further concluded that "by a systemic failure GPDSC is denying Mr. Phan the basic resources to mount an effective defense." However, uncertain of its authority to undertake the remedies requested by the defense, the trial court denied the requested relief and stated that it would "await[ ] further direction from the Georgia Supreme Court on how to proceed."

On appeal, this Court vacated the trial court's order and remanded the case with instructions to (1) conduct further analysis on the existence of a "systemic breakdown" in the public defender system, see *Vermont v. Brillon*, 556 U. S. 81, 94-95 (III) (C) (129 SC 1283, 173 LE2d 231) (2009), and (2) apply its findings in resolving the merits of Phan's speedy trial claim. In addressing the first issue, we directed the trial court specifically to determine "whether, with regard to the individualized facts of this specific case, the entire public defender system has broken down such that no publicly-funded and constitutionally-effective attorney from any source was available to represent Phan." *Phan I*, supra, 287 Ga. at 697. We further instructed:

> The trial court's assessment should include an analysis of alternative sources of funding and alternative representation if necessary under the circumstances of this particular case. . . . The trial court may also want to consider alternatives to travel to Vietnam, such as phone or internet interviews of witnesses.

Id. at 698-699. The determination as to the existence of a "systemic breakdown" in the public defender system, we explained, "becomes part of the balance in determining whether a speedy trial violation

has occurred" under the well established framework of *Barker v. Wingo*, 407 U. S. 514 (92 SC 2182, 33 LE2d 101) (1972). *Phan I*, supra at 700.

The trial court held a remand hearing in October 2010. By that time, a limited pool of funds had been located from which the GPDSC had been able to pay all of Adams' past-due bills in full. Testimony was adduced that this pool of funds was potentially available for Phan's defense going forward, though whether this was a legally legitimate use of these particular funds was the subject of debate. Further testimony was presented that funding for the defense could also potentially be made available from Gwinnett County. Another option, according to the hearing testimony, was for the GPDSC to terminate its contract with Adams and Harvey and bring the case back "in house" to the GPDSC capital defender division. The director of the capital defender division testified that his office had recently hired an additional staff attorney, and that, while his "first choice" would be to keep the case in Adams' and Harvey's hands for the sake of continuity, his office, if necessary, would be able to fully staff the case within a few months.

Based on this testimony, the trial court found that the public defender system was not irretrievably broken, as constitutionally effective attorneys were then available to represent Phan. Noting that Adams had recently relocated his law practice to South Carolina, the court further ordered that Adams and Harvey be removed as counsel and that staff attorneys from the capital defender division be "immediately assigned" to Phan's case. Having found no systemic breakdown in the public defender system, the trial court proceeded to conduct a speedy trial analysis and rejected Phan's claim of a speedy trial violation. The case is now ripe for our review.

1. Alleged violations of the constitutional right to a speedy trial are analyzed in two stages under the well established framework set forth in *Barker v. Wingo*, supra. "First, the court must determine whether the interval from the accused's arrest, indictment, or other formal accusation to the trial is sufficiently long to be considered 'presumptively prejudicial.' " *Ruffin v. State*, 284 Ga. 52, 55 (2) (663 SE2d 189) (2008) (citation omitted). If the delay has crossed this threshold, the court must proceed to a "delicate, context-sensitive, four-factor balancing test" to determine whether a speedy trial violation has occurred. Id. This balancing test requires analysis of (1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of the right; and (4) the prejudice to the defendant. Id. at 56 (2) (b). We review a trial court's disposition of a motion to dismiss on speedy trial grounds for abuse of discretion, id. at 65 (3), and "a trial court's findings of fact and its weighing of disputed facts will be afforded deference on appeal." *Williams v.*

*State*, 277 Ga. 598, 599 (1) (592 SE2d 848) (2004).

(a) *Length of the delay*. Where no trial has occurred, the length of delay should be calculated from the date of arrest or formal accusation to the date on which the motion to dismiss on speedy trial grounds was decided. *State v. Porter*, 288 Ga. 524 (2) (b) (705 SE2d 636) (2011). There is no dispute that the more than four-year delay at issue here has crossed the threshold of presumptive prejudice. See, e.g., *Boseman v. State*, 263 Ga. 730, 732 (438 SE2d 626) (1994) (27-month delay in death penalty case presumptively prejudicial). Further, as the trial court found and the State does not dispute, the length of the delay should be weighed against the State. See *Porter*, 288 Ga. at 527 (2) (c) (1).

(b) *Reasons for the delay*. This factor, which examines whether the defendant or the State bears more responsibility for the delay, is "pivotal in evaluating the strength of a constitutional speedy trial claim, as it can color the consideration of all other factors." *Ruffin*, supra, 284 Ga. at 59 (2) (b) (ii). Deliberate delay intended to hinder the defense must be weighed heavily against the State, whereas delay occasioned by more "neutral" causes, such as negligence or overcrowded dockets, weighs less heavily against the State. *Vermont v. Brillon*, supra, 556 U. S. at 90 (II). On the other hand, delay caused by the defense weighs against the defendant. Id. at 90-91 (II). Here, the trial court concluded that "because the defense has repeatedly contributed to the delay," this factor should be weighed against the defense.

While we agree that the defense bears some responsibility for the delay, we cannot, even under a deferential standard of review, agree that the defense alone is to blame. The trial court was correct in observing that the defense on several occasions sought and was granted continuances in the case, while the State repeatedly maintained that it was ready to proceed. See *Robinson v. State*, 287 Ga. 265 (1) (b) (695 SE2d 201) (2010) (delay resulting from defense continuance request chargeable against defense). However, it is also clear that these continuance requests stemmed directly from the funding issues that manifested first in the partial rejection of the defense's travel request. The prosecution had no need to delay the case, as it possessed the resources necessary to proceed. To lay blame entirely on the defense for seeking continuances under these circumstances would be manifestly unjust. See *Weis v. State*, 287 Ga. 46, 50 (1) (b) (694 SE2d 350) (2010) ("[i]n light of the State funding issues that contributed to counsels' inability to move the case forward . . . , the delay in bringing the case to trial . . . is properly weighed against the State").

Moreover, the trial court seemingly did not take into account the lengthy period of time *before* the defense began seeking continu-

ances, a period of roughly three years from Phan's arrest in March 2005. As to this period, the record is largely silent regarding the reasons for delay, although it does appear that the six-month delay between Phan's arrest and his indictment in September 2005 was in part owing to defense counsel's ultimately unsuccessful effort to negotiate a plea agreement. Once the indictment issued, however, more than a year elapsed before the prosecution turned over its discovery to the defense in October 2006 and then well over another year passed before the funding issues erupted and were brought to the trial court's attention in March 2008. As the record reveals no specific reason for this delay, we must attribute it, at least in part, to the State's negligence in moving the case forward. See *Ruffin*, supra, 284 Ga. at 61 (2) (b) (ii); *Boseman*, supra, 263 Ga. at 733 (1) (b).

However, just as we cannot blame the defense alone for the delay initiated by its continuance requests, so also are we unable to consider the State solely responsible for the delay prior to that time. In addition to the defense's role in delaying the issuance of the indictment, we also note that defense counsel waited until December 2007 — more than two years from the time the death notice issued and more than a year after production of the State's discovery — to request funds for the trip to Vietnam. Further, the evidence strongly suggests that, had the request been submitted earlier, prior to the GPDSC's imposition of the one-attorney limit on out-of-state travel, it would have been approved as a matter of course,[7] and the landscape of this case might look dramatically different. In addition, after being notified that their travel request was being approved only in part, defense counsel shifted their focus from investigating the case to protesting their travel budget. Rather than attempting to move the case forward simultaneously with attempts to secure more travel funds, defense counsel appear to have devoted the bulk of their attention to the funding issues as the months and then years began slipping by and the State budget problems grew progressively worse, culminating in the suspension of all funding for the case.

It was at this point, in late 2008 and early 2009, that the situation began to resemble a "systemic 'breakdown in the public defender system'" of the type that the United States Supreme Court has recognized as being chargeable against the State in a speedy trial analysis. See *Vermont v. Brillon*, supra, 556 U. S. at 94 (III) (C) (citation omitted). However, as we made clear in *Phan I*, at the time the trial court declared a "systemic failure" on the part of the

---

[7] Indeed, testimony at the August 2008 hearing from the director of the capital defender division indicated that, absent the various budget directives, the GPDSC would likely have approved the travel request in its entirety.

GPDSC, the trial court did not, in fact, have all the evidence necessary to evaluate whether a "systemic breakdown" as contemplated in *Vermont v. Brillon* had occurred. Based on the evidence presented at the remand hearing regarding the availability of defense counsel other than Adams and Harvey, we conclude that the trial court correctly determined that such a breakdown had not occurred. See *Weis*, supra, 287 Ga. at 50 (1) (b) ("there can be no 'systemic breakdown in the public defender system' . . . when there are still attorneys within that system who are available to represent the criminal defendant").

Overall, the government and the defense share the responsibility for the delays in this case. The prosecution was less than proactive in moving the case forward during the initial years after indictment; the defense also appears to have been in no hurry. This initial, largely unexplained delay pushed the case squarely into the vortex of the State budget crisis, which was beyond the control of either the prosecution or the defense. Though the State is ultimately responsible for delays occasioned by budget problems, see *Weis*, supra, 287 Ga. at 50 (1) (b), the defense bears responsibility to the extent it allowed its fight for travel funds for two attorneys rather than one to become its primary focus in the litigation. Given the various, intertwined reasons for the delay, it is impossible to precisely apportion the parties' relative shares of responsibility. Therefore, we find that the second factor of the *Barker* analysis remains neutral. See *Robinson*, supra, 287 Ga. at 268 (1) (b) (where both parties are to blame for delay, second *Barker* factor remains neutral).

(c) *Defendant's assertion of the right.* "The relevant question for purposes of the third [speedy trial] factor is whether the accused has asserted the right to a speedy trial 'in due course.' " *Ruffin*, supra, 284 Ga. at 63 (2) (b) (iii) (citation omitted). This factor "requires a close examination of the procedural history of the case with particular attention to the timing, form, and vigor of the accused's demands to be tried immediately." Id. Because delay often works to the defendant's advantage, see *Vermont v. Brillon*, supra, 556 U. S. at 90 (II), this factor is afforded " 'strong evidentiary weight.' " *Marshall v. State*, 286 Ga. 446, 447 (1) (c) (689 SE2d 283) (2010) (quoting *Barker v. Wingo*, supra, 406 U. S. at 531). Accord *State v. Porter*, supra, 288 Ga. at 529 (2) (c) (3) ("an extended delay in asserting the right to a speedy trial should normally be weighed *heavily* against the defendant").

Here, Phan first asserted his right to a speedy trial in April 2009, more than four years after his arrest and three-and-a-half years after his indictment. At no point during the years-long period before the funding issues became salient did the defense assert any objection to the slow pace of the case, and the defense actively sought further

delay once the funding issues did emerge. Thus, as the trial court found, this factor weighs heavily against the defense. See *Robinson*, supra, 287 Ga. at 268-269 (1) (c); *Boseman*, supra, 263 Ga. at 733 (1) (c) (third factor weighed against death penalty defendant who waited more than two years from the date of arrest to assert speedy trial right).

(d) *Prejudice*. Whether the defendant has established prejudice as a result of the delay requires consideration of the oppressiveness of pre-trial incarceration, undue anxiety suffered by the defendant, and impairment of his ability to mount a defense. *Ruffin*, supra, 284 Ga. at 65 (2) (b) (iv). As the trial court correctly noted, Phan has adduced no evidence as to any of these considerations. Rather, Phan contends that, because of the length of time that has now passed, prejudice should simply be presumed.

We have acknowledged that "the greater the delay between charging and trial, the greater the presumed impairment of witness recollections and other evidence needed for a fair and reliable trial." *State v. Porter*, supra, 288 Ga. at 531 (2) (c) (4). However, where the defendant has made no attempt at all to demonstrate (or even argue) that he has suffered any particular prejudice to his mental or physical condition or to his defense strategy, any prejudice that might be presumed by virtue only of the passage of time will carry very little weight in the *Barker* analysis. See *Harris v. State*, 284 Ga. 455 (667 SE2d 361) (2008) (where no showing of oppressive pre-trial incarceration or undue anxiety and no claim of actual prejudice to defense, presumed prejudice attending more than five-year delay insufficient to overcome defendant's failure to assert speedy trial right in a timely fashion). Accord *Bowling v. State*, 285 Ga. 43, 47 (2) (673 SE2d 194) (2009). We therefore agree with the trial court that this factor does not measurably favor the defense.

(e) *Summary*. We conclude that the trial court properly weighed the length of the delay against the State and properly weighed Phan's delay in asserting his speedy trial right heavily against the defense. We further conclude that the trial court incorrectly weighed the reasons for the delay against the defense because both parties bore some responsibility for it, and that this factor should have remained neutral in the analysis. In addition, we find that the trial court correctly found no actual prejudice and that, to the extent prejudice was presumed,

> the presumptive prejudice arising from any delay . . . was insufficient for [Phan] to prevail on his constitutional speedy trial claim, given that there was no demonstrable prejudice to [Phan's] defense and [Phan] was dilatory in asserting his rights. [Cit.]

*Bowling,* supra, 285 Ga. at 47 (2). In sum, the trial court did not abuse its discretion in denying Phan's motion to dismiss on speedy trial grounds.

2. Phan contends that his rights to counsel and due process have been violated by the trial court's decision to replace Adams and Harvey with staff attorneys from the GPDSC's capital defender division. We first observe that "[a]n indigent defendant has no right to compel the trial court to appoint an attorney of his own choosing." *Davis v. State,* 261 Ga. 221, 222 (403 SE2d 800) (1991).

> However, when a defendant's choice of counsel is supported by objective considerations favoring the appointment of the preferred counsel, and there are no countervailing considerations of comparable weight, it is an abuse of discretion to deny the defendant[ ] . . . the counsel of his preference.

Id. "[T]he court's exercise of its discretion is to be reviewed in light of the factors before the court at the time of its decision." *Amadeo v. State,* 259 Ga. 469, 470 (2) (384 SE2d 181) (1989).

Here, while we recognize the value in having original counsel continue their work on the case — for reasons of efficiency and continuity and due to the relationship of trust they have undoubtedly developed with their client over these many years — we simply cannot overlook the compelling "countervailing considerations" that exist. First and foremost, retaining current counsel would perpetuate the funding problems that have plagued this case thus far. See *Weis,* supra, 287 Ga. at 50-51 (1) (b) (potential for constitutional speedy trial violation due to funding problems "surely qualifies as a 'countervailing consideration' justifying the appointment of replacement counsel, even over the defendant's objection"). In addition, as the trial court noted, Adams has relocated his practice to Charleston, South Carolina, increasing the costs associated with his continued representation of Phan and further complicating efforts to move the case forward expeditiously. See *Davis,* supra, 261 Ga. at 223 (Hunt, J., concurring in part and dissenting in part) (listing as potential "countervailing consideration" the fact that "the defendant's choice maintains his primary office some considerable distance from the court"). For these reasons, we conclude that the trial court acted within its discretion in replacing Phan's counsel. See *Davenport v. State,* 283 Ga. 29 (2) (656 SE2d 514) (2008) (no abuse of discretion in replacing indigent defendant's original appointed counsel, as trial court's reasonable concern over counsel's diligence and preparedness was "countervailing consideration" justifying court's decision). Cf. *Grant v. State,* 278 Ga. 817 (607 SE2d 586) (2005) (trial court abused discretion in removing appointed counsel of death penalty defen-

dant, as trial court's interest in involving local counsel in case was not a sufficient "countervailing consideration" to justify removal of defendant's preferred counsel); *Amadeo*, supra, 259 Ga. at 470 (2) (trial court abused discretion in refusing to reappoint prior defense counsel on retrial after grant of habeas relief, as desirability of involving local lawyers was not a sufficient "countervailing consideration" outweighing reasons supporting defendant's choice).

We do note the defense's contention that the trial court's resolution fails to address how the GPDSC will pay for the Vietnam trip, expert witnesses, and other costs necessary to mount an effective defense that are not included within the budgeted salaries of GPDSC staff attorneys. However, we also note that evidence was presented at the remand hearing indicating that the GPDSC, and possibly Gwinnett County, currently have funds available for such travel and other investigative expenses. Thus, it appears that funds for such undertakings — the necessity of which is essentially undisputed[8] — will be available to Phan's new counsel. *Boseman*, supra, 263 Ga. at 733 (1) (b). If the funding for such undertakings again becomes an issue, however, whether due to an actual money shortage or an agency policy in contemplation of such shortage, we warn that

> the clock is still ticking. It has now been [almost seven] years since [Phan] was [arrested], and the vigor and formality with which he has presented his constitutional speedy trial claim are no longer subject to challenge.

*Ruffin*, supra, 284 Ga. at 66 (3). Further delays caused by State budget problems could well tip the scales in the *Barker* analysis in Phan's favor.

3. We emphasize that our determination that the trial court acted within its discretion should in no way be construed as an endorsement of the system that has led us down this tortuous path thus far. The interests of no one — neither prosecutors nor defendants, victims nor taxpayers — are served by the uncertainty and delay attending to a chronically underfunded indigent defense system. This case is an object lesson in the perils of such underfunding; the fact that the dismissal of murder charges has had to be legitimately considered for reasons so far removed from the accused's guilt or innocence underscores the stakes involved. We can only hope that those within the branches of government empowered

---

[8] At the remand hearing, the defense presented testimony, which the State has not challenged, to the effect that an effective mitigation investigation must be conducted in person as opposed to the less costly route of communicating with witnesses via remote means.

to remedy these institutional problems will make it a priority to do so.

*Judgment affirmed. All the Justices concur, except Carley, P. J., and Hines, J., who concur in judgment only.*

DECIDED FEBRUARY 27, 2012.

Bruce S. Harvey, Christopher W. Adams, Jennifer S. Hanson, K. Julie Hojnacki, Kimberly H. Cornwell, for appellant.

Daniel J. Porter, District Attorney, Lisa A. Jones, Assistant District Attorney, for appellee.