NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: December 20, 2022

S22A0958. DAVIS v. THE STATE.

PINSON, Justice.

Patricko Davis was convicted of felony murder and other crimes in connection with the July 2014 shooting death of Takeenan Williams.[1] On appeal, Davis contends that (1) he was denied his

---

[1] The shooting occurred on July 24, 2014. In November 2014, Davis was indicted for malice murder (Count 1), two counts of felony murder (Counts 2 and 3), and aggravated assault (Count 4) in relation to the shooting death of Williams. He was also indicted for criminal attempt to sell marijuana (Count 5), two additional counts of aggravated assault in relation to two other alleged victims (Counts 6 and 7), and possession of a firearm during the commission of a felony (Count 8). At Davis's trial in February 2017, the trial court directed verdicts on Counts 6 and 7. As to the remaining counts, the jury found Davis guilty of one count of felony murder, the aggravated assault underlying the felony murder, and the firearm-possession count, and not guilty of the remaining counts. Davis was sentenced to serve life in prison for the felony murder plus a consecutive, suspended five-year term for the firearm-possession count; the trial court merged the aggravated assault count into the felony murder count for sentencing purposes. On March 2, 2017, Davis filed a premature motion for new trial, which ripened upon the entry of Davis's final disposition on March 7, 2017. See *Southall v. State*, 300 Ga. 462, 464-467 (1) (796 SE2d 261) (2017). Through new counsel, Davis filed an amended motion for new trial in September 2021. Following a hearing, the trial court denied

constitutional right to a speedy trial; (2) the trial court erred by declining to admit "reverse 404 (b)" evidence about a later crime committed by a friend of Williams who was present when Williams was shot, which Davis claimed was relevant to the friend's "intent" and "opportunity" to carry a gun; and (3) trial counsel rendered constitutionally ineffective assistance by failing to call a bullet-trajectory expert to support Davis's self-defense claim and in his handling of the reverse 404 (b) evidence.

None of Davis's claims has merit. The trial court did not abuse its discretion in rejecting Davis's speedy-trial claim based on the court's careful application of the relevant factors, which included determinations that Davis was himself responsible for some portion of the delay, did not assert his right to a speedy trial promptly, and failed to establish any actual prejudice resulting from the delay. Davis's claim that the trial court erred by not admitting his reverse

---

the motion in an order entered on March 15, 2022. Davis filed a timely notice of appeal on March 16, 2022 and an amended notice of appeal on March 22, 2022. The appeal was docketed to the August 2022 term of this Court and was thereafter submitted for a decision on the briefs.

404 (b) evidence fails because the court never ruled that the evidence was not admissible; rather, Davis simply gave up on trying to introduce the evidence. Finally, his claims of ineffective assistance fail because he has not established that trial counsel performed deficiently: Counsel made a strategic decision to establish the facts needed to support Davis's self-defense claim through cross-examination of a prosecution witness and succeeded in getting favorable testimony. And the reverse 404 (b) evidence would not have been admissible because it was classic propensity evidence, so counsel was not deficient for failing to introduce it. We therefore affirm Davis's convictions and sentences.

1. On the afternoon of July 24, 2014, Davis shot and killed Williams during a drug transaction between Davis and Williams's friend, Demetrise Maye. Davis never denied shooting Williams. Rather, he claimed at trial that he shot Williams in self-defense. His story was that Maye pulled a gun to try to rob him, so he pulled his own gun and shot Williams in the ensuing fray.

(a) The shooting was witnessed by several bystanders who were walking in the parking lot of a Sandy Springs office complex where they worked. The group noticed three men having a heated argument in the adjacent parking lot of the neighboring Sheraton Hotel. The witnesses testified that one of the men was waving a gun at one of the other men, yelling, "give me my sh*t" or "where's my sh*t," and they described hearing a single gunshot followed by a pause and then five or six more shots.

One of these witnesses testified that, after the first shot, the victim tried to crawl away over the guard rail separating the two parking lots and that, when the five or six shots were fired, the shooter was standing and "closing in" on the victim, whose back and side were facing the shooter. That witness, who tried to render aid after the shooting stopped, testified that the victim was lying on the ground beyond the guard rail "like falling down the hill but face up," with his feet higher than his head.

(b) Maye and Williams's girlfriend, Elizabeth Lazalde, both testified for the State. They each testified that on the day of the

4

shooting, Lazalde drove Maye and Williams to meet Davis at a Sandy Springs apartment complex. Lazalde parked at the nearby Sheraton Hotel and stayed in the car while Williams and Maye got out and walked over to the apartments.

Maye testified that he found Davis at the apartments, and Davis gave Maye seven grams of marijuana. Maye gave Davis half the money owed, said Williams had the other half, and led Davis back to Lazalde's car. Williams joined him along the way, and Maye gave Williams the marijuana. As they reached the car, Maye heard Williams and Davis arguing and saw Davis produce a gun and point it at Williams, saying, "give me my sh*t." Maye backed away, heard the two "scuffling," and saw Williams take off running. Davis began firing, emptying his clip, and then ran away.

Lazalde testified that she sat in her car while Williams and Maye went to the apartments. When the pair returned, along with Davis, she observed Davis and Williams talking in a "hostile" manner. She then saw Davis pull out a gun and point it at Williams, prompting Williams to try to grab the gun from Davis's grip. The

5

pair began wrestling, and the gun hit the ground. Davis picked it up and fired the first shot, followed by five or six more shots. According to Lazalde, neither Williams nor Maye was carrying a gun that day.

(c) The defense presented several witnesses, including Davis. Davis testified that on the day of the shooting, Maye arranged to buy some marijuana. After the transaction, Maye asked Davis if he was selling his watch, and Davis responded that he was and allowed Maye to try it on. Maye then said he wanted to buy the watch, told Davis his money was in the car, and, joined by Williams along the way, led Davis to the Sheraton parking lot. Once back at the car, Maye asked whether Davis had change. Davis responded that he did and pulled out some cash, at which point Maye turned around, pointed a gun at Davis, and told him to "give it up." Davis pulled out the gun he was carrying in his waistband and cocked it, and Williams walked over and grabbed Davis. Williams and Davis tussled over the gun, the gun discharged, both men fell to the ground, and, as Williams got up to charge at Davis, Davis grabbed his gun and fired it. Davis testified that he did so because he believed

6

Williams was going to kill him, and that he ran because he was scared.

(d) Aside from Davis's testimony, there was no evidence that Maye had a gun in his possession or that more than one gun was present at the scene. The evidence in fact suggested the opposite: the seven shell casings recovered from the scene were determined to have been fired from the same .40-caliber Smith & Wesson Taurus firearm, and the three intact bullets recovered from Williams's body were also confirmed to have been fired from the same .40-caliber gun. A box for a Taurus .40-caliber handgun with two magazines inside was found in a search of Davis's apartment.

The medical examiner testified that Williams had sustained a total of five gunshot wounds, including a fatal wound to the back. Some of the shots entered from the front of his body and some from the back, and all entered at an upward angle. The medical examiner testified on cross-examination that this upward trajectory "could be" consistent with the shots having been fired up from the ground, as the defense argued. But on redirect she testified that the angles of

7

the shots were also consistent with the victim having been shot while lying with his feet higher than his head. Crime-scene investigators testified that the pattern of shell casings left at the scene suggested that the shooter was moving around while firing the gun.

2. Davis first contends that he was denied his constitutional right to a speedy trial. In reviewing the trial court's ruling on this issue, we accept the trial court's factual findings unless they are clearly erroneous, and we will affirm its ultimate conclusion absent an abuse of discretion. See *Burney v. State*, 309 Ga. 273, 286 (4) (845 SE2d 625) (2020).

(a) About 30 months elapsed between Davis's arrest in August of 2014 and his trial in February 2017. Davis was indicted in November 2014, roughly three months after his arrest. Following his indictment, Davis filed a number of pretrial motions, and the State served Davis with its discovery materials. In May 2015, Davis moved for a 60-day continuance from an upcoming motions calendar, citing the "voluminous" discovery and investigative materials in the

case and the numerous witnesses whom the defense still intended to interview. In a June 2015 motion seeking additional funds for the defense, Davis noted that the defense still needed to interview "over twenty witnesses."

On April 5, 2016, Davis submitted a filing styled "Request for Trial," stating that he was "ready for trial" and "would request that this matter proceed to trial immediately."[2] Nine months later, on January 9, 2017, Davis filed a motion to dismiss his indictment, asserting that the continued delay in bringing his case to trial violated his constitutional right to a speedy trial. After a hearing,

---

[2] Although this filing may have been intended as a statutory speedy-trial demand, it did not comply with the speedy-trial statute. See OCGA § 17-7-171. That Code section provides that, absent "special permission of the court," any speedy-trial demand must be filed "at the term of court at which the indictment is found or at the next succeeding regular term thereafter." Id. at (a). Davis was indicted on Friday, November 7, 2014, which was in the November 2014 term of court, and the succeeding (January 2015) term would have ended on March 1, 2015, the day before the first Monday in March. See OCGA § 15-6-3 (3) (terms of Fulton County Superior Court begin on first Monday of January, March, May, July, September, and November). So the Request for Trial was filed more than a year after the statutory deadline. Also, OCGA § 17-7-171 (a) requires that the demand "clearly be titled 'Demand for Speedy Trial'" and "reference this Code section within the pleading"; the Request for Trial complied with neither of these requirements.

9

the trial court denied the motion, and trial began on February 13, 2017. After he was convicted, Davis renewed his speedy-trial claim in a motion for new trial. The court reaffirmed its earlier ruling, concluding that Davis was not denied his constitutional right to a speedy trial.

(b) The Sixth Amendment to the United States Constitution guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial," U.S. Const., Amend. VI. When a criminal defendant claims that this right has been violated, the trial court conducts a two-step inquiry. See *Johnson v. State*, 300 Ga. 252, 257 (3) (794 SE2d 60) (2016) (citing *Barker v. Wingo*, 407 U.S. 514 (92 SCt 2182, 33 LE2d 101) (1972), and *Doggett v. United States*, 505 U.S. 647 (112 SCt 2686, 120 LE2d 520) (1992)). First, the court must decide whether the interval between the defendant's arrest and his trial is long enough to be considered "presumptively prejudicial." *Redding v. State*, 309 Ga. 124, 129 (3) (844 SE2d 725) (2020) (citation and punctuation omitted). A delay of a year or more typically is long enough to presume prejudice. See id.

If presumptive prejudice is established, the trial court then weighs four factors to determine whether the defendant was denied his right to a speedy trial. See *Henderson v. State*, 310 Ga. 231, 235 (2) (850 SE2d 152) (2020); *Redding*, 309 Ga. at 129 (3). This "difficult and sensitive balancing process" assesses (1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the prejudice to the defendant. *Henderson*, 310 Ga. at 235 (2) (invoking "the *Barker-Doggett* factors" to assess federal and state constitutional speedy-trial claims). This assessment is "context-focused," and the trial court's discretion in applying this framework is "substantial." *Johnson*, 300 Ga. at 257-258 (3) (citations and punctuation omitted).

We apply these steps in turn.

(c) The presumptive-prejudice step is straightforward here. "The constitutional right to a speedy trial attaches on the date of the arrest or when formal charges are initiated, whichever occurs first." *Fallen v. State*, 289 Ga. 247, 248 (1) (710 SE2d 559) (2011) (citation and punctuation omitted). The trial court thus properly calculated

the length of the delay here as 30 months, the interval between August 2014 and the start of Davis's trial in February 2017. As the trial court recognized, a 30-month delay is presumptively prejudicial. See *Redding*, 309 Ga. at 129 (3).

(d) We turn next to the four-factor *Barker-Doggett* analysis.

(i) Having calculated the delay at 30 months, the trial court weighed the length of delay against the State, but only "lightly." Davis does not contest that conclusion, and we find no abuse of discretion. See, e.g., *Taylor v. State*, 312 Ga. 1, 13 (4) (b) (i) (860 SE2d 470) (2021) (30-month delay properly weighed against the State); *Cash v. State*, 307 Ga. 510, 515 (2) (b) (i) (837 SE2d 280) (2019) (no abuse of discretion where trial court weighed 28-month delay only lightly against the State).

(ii) In assessing the reasons for the delay, the trial court must consider which party was responsible for the delay, whether the delay was intentional, and, if it was intentional, what the motive was for seeking or causing the delay. See, e.g., *Taylor*, 312 Ga. at 13 (4) (b) (ii) (where both prosecution and defense sought continuances,

12

trial court properly determined that reasons for delay weighed "neutrally"); *State v. Johnson*, 291 Ga. 863, 865-866 (2) (b) (734 SE2d 12) (2012) (noting that "[a] deliberate attempt to delay the trial in order to hamper the defense" should weigh heavily against the State, whereas an unintentional delay due to the prosecutor's negligence or an overcrowded trial court docket should weigh less heavily). When there is no apparent reason for the delay, the delay is "treated as caused by the State's negligence" but "should be weighed only slightly against the State." *Higgenbottom v. State*, 290 Ga. 198, 201-202 (1) (B) (719 SE2d 482) (2011); accord *Fallen*, 289 Ga. at 248-249 (2).

Here, the trial court noted that Davis had not alleged that the delay was due to any deliberate effort on the part of the State. Instead, the court found, the delay was due in equal parts to "overcrowded dockets" and to the defense's needs in completing its investigation. Thus, the court concluded that this factor weighed neutrally.

That conclusion was within the court's discretion. The record

13

clearly supports the court's finding that the delay was attributable in part to Davis's own needs and requests: Davis sought a continuance in May 2015, nine months after his arrest; two months after that, his counsel indicated to the court he still had more than 20 witnesses to interview; and Davis did not ask for a trial date until some 20 months after his arrest, when he filed his Request for Trial. As for the State's role in the delay, it appears that, after Davis filed the Request for Trial, the case appeared on several trial calendars but was not called, and at some point it ended up on the court's "backlog calendar." It was thus appropriate for the trial court to attribute some portion of the delay to the State. See *Higgenbottom*, 290 Ga. at 201-202 (1) (B); *Williams v. State*, 290 Ga. 24, 26 (2) (717 SE2d 640) (2011) (trial court took judicial notice of court's heavy dockets in assessing reasons for delay in trial). Because the record shows that both sides bore some responsibility for the delay, the court did not abuse its discretion in determining that this factor weighed neutrally. See *Phan v. State*, 290 Ga. 588, 595 (1) (b) (723 SE2d 876) (2012) (where both State and defense bore responsibility

14

for delay, this factor "remain[ed] neutral").

(iii) The third factor asks whether the defendant "asserted the right to a speedy trial in due course." *Cash*, 307 Ga. at 517 (2) (b) (iii) (citations and punctuation omitted). This factor focuses on "the timing, form, and vigor of the accused's demands to be tried immediately." Id. (citation and punctuation omitted). Although an accused need not demand a trial at the "first available opportunity," id., his failure to assert his right "with reasonable promptness" will ordinarily weigh heavily against him. *State v. Alexander*, 295 Ga. 154, 158-159 (2) (c) (758 SE2d 289) (2014). Accord *Johnson*, 291 Ga. at 866 (2) (c) ("Because delay often works to the defendant's advantage, the failure of the accused to assert his right in due course generally is accorded strong evidentiary weight." (citations and punctuation omitted)).

Here, the trial court concluded that Davis failed to timely assert his right to a speedy trial. Noting that Davis was represented by counsel "every step of the way," the court determined that, to the extent the Request for Trial was intended as a statutory speedy-trial

15

demand, it was untimely and otherwise failed to comply with statutory requirements, and the court took note of his long delay before asserting his constitutional speedy-trial right.

This conclusion, too, was within the trial court's discretion. The court was correct that Davis's Request for Trial was, if construed as a statutory speedy-trial demand, untimely and non-compliant. See note 2. It was not an abuse of discretion to conclude that this determination, along with Davis's 29-month delay in asserting his constitutional speedy-trial right, weighed heavily against him. See *Phan*, 290 Ga. at 595-596 (1) (c) (this factor weighed heavily against defendant where he failed to "assert any objection to the slow pace of [his] case" for a "years-long period" and then "actively sought further delay" when public-defender funding issues emerged); *Higgenbottom*, 290 Ga. at 201 (1) (C) (this factor weighed heavily against defendant where defendant himself was granted a continuance, failed to file a statutory speedy-trial demand, and waited for more than two years after his arrest to seek dismissal on speedy-trial grounds).

(iv) The final factor is prejudice. When prejudice is presumed based on the length of a delay in trying the case, that presumption not only remains in place but "increases in weight over time." *Cash*, 307 Ga. at 518 (2) (a) (iv) (citation and punctuation omitted). But that does not mean this factor always weighs against the State. If a defendant cannot show evidence of *actual* prejudice, that failure can counterbalance and even outweigh any presumptive prejudice in this analysis. See id. at 518-519 (2) (a) (iv) (where defendant failed to show actual prejudice, prejudice factor did not weigh in defendant's favor, despite presumptive prejudice from 28-month delay).

Actual prejudice is assessed by considering evidence, if any, of "oppressive pretrial incarceration," "anxiety and concern of the accused," and potential impairment of the defense caused by fading memories of witnesses or the loss of exculpatory evidence. *Cash*, 307 Ga. at 519 (2) (a) (iv). Of these types of prejudice, the last is the most serious, "because the inability of a defendant adequately to prepare his case skews the fairness of the whole system." Id. (citation

17

omitted). Accord *Weis v. State*, 287 Ga. 46, 55 (1) (d) (694 SE2d 350) (2010) (possibility of harm to defense is the "most serious" of the forms of prejudice (quoting *Barker*, 407 U.S. at 532)).

At the hearing on Davis's motion to dismiss, Davis testified about the conditions of his confinement at the Fulton County jail, citing gang violence within the jail, thefts of his belongings, inedible food, extreme cold, and trauma from seeing another inmate who had hanged himself. He also testified about the anxiety he experienced from being separated from his children, not knowing when he would go to trial, and the deaths of several people close to him during his time in jail. Davis's counsel further noted the defense's concerns that a particular eyewitness who was "crucial" to establishing exactly how the shooting transpired might become uncooperative, although he conceded he had been in touch with the witness and that she had indicated she would accept a subpoena.

The trial court found that Davis had failed to establish any actual prejudice. Noting the absence of any contemporaneous documentation of Davis's complaints about jail conditions and the

court's own assessment that Davis was "obviously exaggerat[ing]" in his testimony, the court found that Davis had offered no specific evidence of undue oppressiveness or unusual anxiety. See *Jackson v. State*, 272 Ga. 782, 785 (534 SE2d 796) (2000) (to show oppressiveness, defendant must offer specific "proof of sub-standard conditions or other oppressive factors beyond those that necessarily attend imprisonment" (citation and punctuation omitted)). Likewise, the court found no evidence of any prejudice to Davis's defense, noting that the witness in question was under subpoena.[3] On this record, the trial court's factual findings were not clearly erroneous, and the court did not abuse its discretion in determining that Davis failed to establish prejudice. See *Weis*, 287 Ga. at 55 (1) (d) (no prejudice established where no witnesses were unavailable for defense's case-in-chief); *Jackson*, 272 Ga. at 785 (no prejudice established where defense offered no evidence beyond "general claims of anxiety [and] poor conditions" in the jail). See also *Sweatman v. State*, 287 Ga. 872, 874-875 (4) (700 SE2d 579) (2010)

---

[3] This witness did in fact testify at trial for the defense.

19

(trial court's findings of fact on a speedy-trial claim are given particular deference where they are "based on live testimony and the trial court['s] . . . opportunity to assess the credibility of the witnesses").

(e) Having assessed each of the *Barker-Doggett* factors, the trial court concluded that, although the State was negligent in failing to bring Davis to trial in a timely manner, that negligence was outweighed by Davis's "significant" delay in asserting his right to a speedy trial, combined with the absence of any actual prejudice. This conclusion was reasonable and did not amount to an abuse of discretion. See *Cash*, 307 Ga. at 520 (2). So we affirm the trial court's denial of Davis's constitutional speedy-trial claim.

3. Davis next contends that the trial court erred by declining to admit reverse 404 (b) evidence about an incident that occurred in Alabama 16 months after Williams's murder, in which Maye had allegedly pulled a gun in a bar fight. Davis filed a pretrial notice of intent, which stated that he intended to present this evidence to show "Maye's opportunity and intent to carry a gun on his person."

20

See generally OCGA § 24-4-404 (b) ("[e]vidence of other crimes, wrongs, or acts . . . . may . . . be admissible [to show] opportunity[ or] intent"). He claimed that this evidence was relevant to his self-defense claim.

Davis contends that the trial court erred in "declining to admit" this evidence. But Davis has failed to identify any ruling to that effect by the trial court. Before trial, the court took the matter under advisement without ruling on it. And at trial, a different judge, while expressing skepticism about whether the evidence was admissible, let Davis explore opportunities to introduce it. First, the court allowed Davis's counsel to voir dire Maye about this incident outside the jury's presence, but Maye asserted his privilege against self-incrimination under the Fifth Amendment to the United States Constitution and declined to testify further on the subject.[4] Next, the court agreed to Davis's counsel's request to have an out-of-state

---

[4] Maye had already testified—at an earlier point during his testimony and also outside the jury's presence—that he had been arrested in connection with this incident but not yet charged and that his lawyer had instructed him not to discuss the case.

21

subpoena issued for the police officer to whom Maye had allegedly made a statement about the Alabama incident. But the next day, before the court issued anything, Davis's counsel told the court that the defense had decided to "move beyond" the issue, and no further efforts were made to present this evidence. Absent a ruling preventing Davis from introducing evidence of the prior incident, and given his abandonment of the issue, Davis's claim that the trial court erred in this regard necessarily fails. See, e.g., *Dobbins v. State*, 309 Ga. 163, 167 (3) (844 SE2d 814) (2020) (defendant could not assert error in trial court's failure to give a curative instruction where the trial court offered to give such an instruction and defendant declined).

4. In his final enumeration, Davis contends that his trial counsel rendered ineffective assistance in two respects. To succeed on a claim of ineffective assistance, a defendant must establish both that his counsel's performance was deficient and that he was prejudiced as a result of that deficient performance. See *Washington v. State*, 313 Ga. 771, 773 (3) (873 SE2d 132) (2022) (citing

*Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984)).

To prove deficient performance, a defendant must establish that counsel "performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms." Id. (citation omitted). To overcome the "strong presumption" that counsel performed reasonably, the defendant must show that "no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not." Id. (citation omitted). To prove prejudice, a defendant must establish that there is a "reasonable probability that, but for counsel's deficiency, the result of the trial would have been different." Id. A reasonable probability is a probability "sufficient to undermine confidence in the outcome" of the trial. *Neal v. State*, 313 Ga. 746, 751 (3) (873 SE2d 209) (2022) (citation omitted). An ineffective-assistance claim fails if the defendant fails to establish either deficient performance or prejudice. See *Washington*, 313 Ga. at 773 (3).

In reviewing a trial court's determination on an ineffective-assistance claim, we accept the trial court's factual findings and credibility determinations unless they are clearly erroneous, but we independently apply the relevant legal principles to the facts. See *Sullivan v. State*, 301 Ga. 37, 40 (2) (799 SE2d 163) (2017).

(a) Davis first contends that trial counsel performed deficiently by failing to call an expert witness "to explain bullet trajectory," to show that the shot to Williams's back did not necessarily indicate that he was being fired on while running away.

At the motion-for-new-trial hearing, Davis called a witness whom the trial court qualified as a bullet-trajectory expert. That witness testified that, after reviewing the evidence, he believed the shooting could have taken place the way Davis described it: that is, Davis had been firing from the ground, hit Williams first in the legs as Williams approached him, and then, as Williams instinctively began turning away, the fatal bullet hit him in the back. In addition to this expert witness, Davis also called trial counsel, who testified that he had not considered hiring a bullet-trajectory expert for trial.

Counsel testified that he believed the most critical fact to establish in support of Davis's self-defense claim was that Davis had fired his gun from the ground and that he had believed he could establish this fact through his cross-examination of the medical examiner. Counsel also testified that, in hindsight, he should have done more to show the jury that the shot to Williams's back was not a straight shot fired at him as he was running away.

Based on this record, Davis has failed to prove that trial counsel's performance was deficient. An attorney's decision about which defense witnesses to call is a classic matter of trial strategy, and such a decision will not form the basis for an ineffectiveness claim "unless it is so unreasonable that no competent attorney would have made th[at] decision under the circumstances." *Sullivan v. State,* 308 Ga. 508, 511 (2) (a) (842 SE2d 5) (2020) (citation and punctuation omitted). Accord *Butler v. State,* 313 Ga. 675, 684 (4) (b) (872 SE2d 722) (2022). In addition, "hindsight has no place in an assessment of the performance of trial counsel, and a lawyer second-guessing his own performance with the benefit of hindsight has no

25

significance for an ineffective assistance of counsel claim." *Simpson v. State*, 298 Ga. 314, 318 (4) (781 SE2d 762) (2016) (citation and punctuation omitted). Here, the record shows that trial counsel made a strategic choice to establish the facts needed to support Davis's self-defense claim through cross-examination of the medical examiner. And counsel succeeded in getting the medical examiner to admit that Davis's gunshot wounds could have been inflicted by shots being fired from the ground, which counsel believed was the critical fact. Davis has thus failed to overcome the strong presumption that counsel's performance was objectively reasonable. See *Birdow v. State*, 305 Ga. 48, 52-53 (2) (823 SE2d 736) (2019) (no deficient performance where counsel opted not to call defense expert and instead relied on cross-examination of State's witness to help establish self-defense claim); *Matthews v. State*, 301 Ga. 286, 289 (2) (800 SE2d 533) (2017) (no deficient performance where counsel elected to use cross-examination and argument to advance defense theory rather than calling defense expert). And counsel's assessment in hindsight that he could have done more does not

change this conclusion. See *Simpson*, 298 Ga. at 318 (4). So this claim of ineffective assistance fails.

(ii) Davis also contends that trial counsel's handling of the reverse 404 (b) evidence amounted to ineffective assistance. Davis claims that the defense lost the opportunity to present evidence of the Alabama bar incident, which showed "Maye's inclination to pull guns on other people," because counsel was not prepared to present an alternative witness when Maye asserted his Fifth Amendment privilege.

This claim fails as well. Davis's own description of the purpose for offering this evidence makes clear that the evidence was "propensity" evidence, which is not admissible. See OCGA § 24-4-404 (a) ("Evidence of a person's character or a trait of character shall not be admissible for the purpose of proving action in conformity therewith on a particular occasion."); *Roberts v. State*, No. S22A0420, 2022 WL 16627232, at *5 (Ga. Nov. 2, 2022) ("[B]efore evidence of other acts is admitted, the State has to show that the other act helps prove something other than the defendant's

27

character or propensity for wrongdoing."). Although Davis argued before the trial court that the evidence was being offered to show Maye's "intent" and "opportunity" to wield a gun, neither of these issues was relevant to Davis's self-defense claim: this evidence could have been helpful to Davis only if the jury could infer that evidence that Maye brandished a gun in an incident 16 months after this one made it more likely that he brandished a gun here. That is textbook propensity evidence, which the jury would not have been allowed to consider. See *Roberts*, 2022 WL 16627232, at \*5; *State v. Jones*, 297 Ga. 156, 159 (1) (773 SE2d 170) (2015). And failing to introduce inadmissible evidence is not deficient performance. See *Mosby v. State*, 300 Ga. 450, 454 (2) (796 SE2d 277) (2017). Davis has therefore failed to prove ineffective assistance on this ground.

*Judgment affirmed. All the Justices concur.*