## 32416. CARTER v. THE STATE.

HALL, Justice.

Roy Carter was murdered between 12:20 and 12:25 a.m., July 2, 1974, by a shotgun blast to the head as he drove his Volkswagen down a lonely dirt road which led from Highway 1 toward his home which was two miles west of the Highway 1 turnoff. Two years and three months later, his wife Judy Carter was indicted for the murder. She was convicted by a jury, sentenced to life imprisonment, and brings this appeal. The prosecution's case against her was entirely circumstantial and failed to meet the standard of proof required to convict. For this reason we reverse.

### The Evidence

The trial evidence showed that Carter (Roy Carter) and Jewell Medders both worked the 3:30 p.m. to 12 p.m. shift at the Seaboard Coastline Railroad. Carter was last seen by Jewell Medders about 12:20 a.m., July 2, 1974, as he turned down the dirt road off Highway 1 toward home.

About 1:10 a.m. on July 2, Evelyn Dunlap, appellant's neighbor and friend, received a phone call from appellant saying that Roy had not come home at the usual time and she was worried. Appellant went to Mrs. Dunlap's house and together they drove in appellant's Oldsmobile searching for Carter on the dirt road.

Appellant and Mrs. Dunlap noticed auto headlights and then saw Carter's Volkswagen partially off the right side of the road, its rear caught in some bushes and its headlights shining across the road, angling back toward Highway 1. Stopping 15 to 20 feet away, appellant left her car in gear and went over to the Volkswagen and looked in, despite Mrs. Dunlap's insistence that they go for help immediately. Mrs. Dunlap noticed that the window on the driver's side of the automobile was shattered. Appellant returned to her car and said that Carter was slumped over, and then backed her car west until she found a place to turn around. She drove to the house of Mr. and Mrs. Lenwood Lee, nearby neighbors.

Appellant had not opened the Volkswagen's door nor touched her husband's body, despite the fact she had been an emergency room nurse. The state urged the inference

that she already knew he was dead because she killed him. Appellant's explanation was that she assumed Carter had had a heart attack because he had complained of chest pains, and she knew of nothing which could help him except a rescue unit with oxygen.

Arriving at the Lee home, appellant told them her husband had been in a car accident and then she telephoned a rescue unit. The Lees noticed that her hair was neat and that she was not crying and did not seem upset. Lenwood Lee drove appellant's Oldsmobile with appellant and Mrs. Dunlap back to the Volkswagen where Lee examined Carter's body. When he raised Carter's head, which was leaning over on the passenger seat, he could see for the first time that the victim's brains were protruding from his head. There were no signs of life. After the rescue squad arrived, Lee took appellant to the hospital. No one had yet told her what was wrong with her husband.

The medical certificate, which was introduced and made a part of the record, gave the cause of death as massive destruction to the right side of the head due to a shotgun blast at close range.

The sheriff arrived approximately an hour and a quarter after death. Not until GBI Agent Yeomans later arrived at approximately 2:15 a.m. was the scene of the crime secured in any effective way. There was no evidence of how many automobiles might have passed up or down the road during this time.

The investigation on the scene showed that Carter's billfold, watch and between ten and fifteen dollars in cash were on his person when he was found. The Volkswagen was in reverse gear.

Sheriff Tanner and Agent Yeomans examined the ground surrounding the Volkswagen for tire tracks. They observed tracks which were similar to the tire tread of appellant's Oldsmobile, which led to a spot about 135 feet west on the dirt road where there were glass and bone fragments with blood. Lee also observed the tire tracks. Yeomans testified that the ground was too sandy to obtain castings of the tracks. The sheriff testified that in his opinion there were three sets of tire tracks "similar to" appellant's. However, he could not say when any of these

tracks were made, nor was there any meaningful comparison of the tracks to other vehicles presently on the scene. Moreover, the tracks in question were never actually proved to have been made by appellant's Oldsmobile, as the tracks had no particularly distinguishing marks.

Appellant told the sheriff where her husband kept a shotgun. The sheriff and Agent Yeomans went to Carter's residence where the victim's truck was parked. They found the truck door open and the seat turned back with a shotgun behind the seat. The breech of the gun was open, the chamber empty and there was a smell of gunpowder. The shotgun was clean of fingerprints except for three "partials" which were too smudged for usefulness. No evidence was introduced to show that the shotgun was actually the murder weapon.

The sheriff testified that the shotgun had been fired "recently," but "recently" was struck on objection. Finally the witness stated on cross examination that he could not tell when it had last been fired. Appellant told investigators that her husband told her on July 1, 1974, that he had killed a snake on their premises. Upon searching, investigators found no snake.

The evidence was that an automatic shotgun, of the type Carter owned, ejected its shell upon firing. Search of the crime scene revealed no shell. State's witnesses acknowledged that when a shotgun is fired, powder particles can adhere to the operator's clothing, or the inside of an automobile from which it was fired. No tests were ever made of appellant's clothing or automobile. No photographs or casts were ever made of the tires on appellant's Oldsmobile.

Noah Carter, the victim's brother, testified that appellant had bought the .12 gauge shotgun and that he had seen her fire a hand gun.

Further prosecution testimony revealed that appellant had been involved in an affair with an x-ray technician at the hospital where she worked as an emergency room nurse. Wilbur Streat, the technician, testified as a state's witness that he and appellant had had an affair, but that the affair had ended about three to four weeks prior to Carter's death. He stated that it was not

and never had been a "love" affair.

Clara Stevens, a hospital lab technician and appellant's friend, corroborated Streat's testimony regarding appellant's affair with him but said it ended some four or five weeks prior to the murder. This state's witness also testified that prior to the murder appellant quit her job at the hospital, where she encountered Streat in her work, and took another job to try to get her home life "straightened out." Moreover, the witness testified that on the night of the killing appellant had telephoned her and asked her to come visit with appellant until Carter came home.

Lowell Lee, a Baptist minister and farmer, was on a party line with the Carters. A week prior to Carter's death, Lee picked up his phone and heard appellant speaking with Ms. Stevens. Ms. Stevens asked if appellant's husband was going to be away that evening so they could have some fun. Appellant replied that she thought he would be working but he might be "in the way." Lee heard another conversation between Streat and appellant in which appellant begged Streat to meet her at her grandmother's house. Lee said this conversation occurred about two weeks before the murder. Appellant denied the conversation.

Harold Chancey testified that he talked with the victim a few days prior to the murder. During this conversation, the victim started crying and Chancey advised him to work out his problems within his family. There was absolutely no evidence of what the problem might have been, or what was meant by "family." Nothing connected appellant to the subject of this conversation.

Appellant contended that she was at home during the shooting of Carter. She testified that on July 1, she and Carter had lunch together. After work, she coached a girl's softball team, then took her two younger daughters to their grandmother's house where they were to spend the night. She picked up a tub of unshelled peas and took it home where she and her two older daughters shelled the peas until 9 p.m. when the two girls drove appellant's Oldsmobile to Mrs. Dunlap's home to pick peas. Appellant called the girls about 10 p.m. to come home and they continued shelling peas until the two daughters went to

bed. At 11:30 p.m. according to appellant, she donned a nightgown and fell asleep reading a book in bed.

Appellant testified that her oldest daughter, Sharon, woke her up because mosquitoes were biting her, and that she sprayed the girl's room and noticed her husband was not yet home although it was about 12:45 a.m. Appellant called the railroad shop but received no answer. She was worried and prevailed upon Mrs. Dunlap to go with her in search of Carter. Seeing car lights on the dirt road, she stopped and recognized her husband's car. She got out and saw the shattered glass and the victim slumped over. Because her husband had complained of chest pains the previous week, appellant believed he had suffered a heart attack and wrecked the car.

Appellant testified further that she had bought the shotgun in 1960 as a Christmas present for her husband. Appellant admitted her affair with Streat, but claimed it was over some weeks prior to the murder and that she and her husband were working out their marital problems. Appellant denied the phone conversation with Streat asking him to meet her at her grandmother's. Appellant further testified that she knew how to use the shotgun but that she did not kill her husband.

Several witnesses corroborated portions of appellant's testimony regarding coaching a softball team, getting peas to shell, and calling Evelyn Dunlap about her husband's lateness. Appellant's two older daughters, Sharon and Julane, corroborated appellant's testimony about some of the events of July 1, and early July 2. Sharon Carter stated that she woke her mother up about 12:45 a.m. to ask her to spray her room for mosquitoes.

Annie King and her daughter Dalonsa, who were living in a trailer on a farm near the dirt road where the victim was found, testified that between 11:30 p.m. and 1 a.m. on July 1-2, they heard a shotgun blast. They then heard what they thought was a truck drive down the road, turn in a driveway, and drive back *east* down the dirt road toward Highway 1. They were able to see the vehicle's lights as it turned around. The Kings had never been questioned by police. They did not live directly on the dirt road, but behind one of the houses on the road. The significance of the Kings' testimony was that it

completely contradicted the theory by which the state hoped to prove appellant guilty. That theory was that the killer had come from, and had returned to the *west*—the direction of appellant's house from the crime scene.

GBI Agent Yeomans was called by the state as a rebuttal witness. He testified that Sharon Carter had told him on July 2 that she had been awakened at 1 a.m. by appellant who stated that she was going to look for her husband.

### The Insufficiency of the State's Case

Considering the sufficiency of the state's case against appellant perhaps the three most damaging items of evidence were the tire tracks, the shotgun, and the affair.

The state pitched its case with respect to the tire tracks on the fact that the tracks appeared to have "backed up" *twice* in a turn-around along the road, presumably before returning to appellant's home. The theory is that since her evidence can account for only one incident of turning around (when she and Mrs. Dunlap left the Volkswagen to drive to the Lees' house) the other incident of "backing up" was to return home earlier after she had shot her husband. However, the conclusion that the car "backed up" was objected to each time it was used, and each time the court instructed the jury to disregard it. The prosecution witnesses did not subsequently describe the appearance of the tracks so that a conclusion of "backing up" could be drawn by the jury. All that was offered and admitted was testimony that two sets of tracks appeared in the place which the state disingenuously called the "turn around place." We must also consider that they were never *proved* to be appellant's tracks; they were merely "similar to" her tracks. Another driver at the scene, one Deen who accompanied the rescue unit, drove a late-model Oldsmobile as did appellant, and his tires were never compared to these tracks. It could not be proved when the tracks were made. The fact that one set "led to" the glass and blood in the road was wholly meaningless, since this debris was in the middle of the roadway and any car proceeding normally down this road would have passed beside it. About all that was proved was that appellant's car might have been the murder vehicle.

The evidence regarding the shotgun is similarly inconclusive. There was no evidence whatever that it was the murder weapon. From its location and its condition, all that was shown was that it might have been.

With respect to the affair with Streat, the bulk of the evidence was that it was over some weeks prior to the murder. The only contrary evidence was given by witness Lowell Lee, who testified that he listened in on the party line he shared with appellant and heard her asking Streat to meet her, within two weeks of the murder. This evidence is contended on appeal to be inadmissible under the eavesdropping statute, Code Ann. §§ 26-3001, 26-3007. However, we need not decide that issue because we reverse on the general grounds, assuming without deciding that the evidence is admissible.

In any event, illicit sexual intercourse with another, without more, is not a motive for murder. There was no evidence that appellant and Streat were in love; none that they wanted to marry; none that appellant wanted a divorce (although it had been discussed and dropped by her and Carter); and none that Carter refused her a divorce. Nor was there any other evidence that appellant benefited from her husband's death. The state called the manager of Farm Production Service who testified that Roy Carter had mortgages of some $59,000 on 153 acres of his land at the time of his death, and that at the time of trial there were no mortgages on the land. That was the extent of the evidence: nothing showed how these mortgages were paid off *if* they were; and nothing showed that appellant owned the land at the time of the trial or that she had benefited financially in any way from her husband's death.

The best that can be said of the state's case is that it proved that appellant could have wanted her husband dead and could have killed him. It completely failed to show that she actually took so much as one step toward that objective. The state's case was built almost entirely on innuendo. This portion of the brief of the Waycross district attorney appears to show the state's theory: "The evidence also shows that the defendant had carried on an illicit love affair, desperately wanted her new lover, had grown impatient, desperate and greedy. She not only

wanted to get rid of her husband but she wanted the farm, her children, and lover, she wanted it all. Her need and greed in her own bent mind could only be resolved in one way. If she divorced her husband, no judge or jury would give her the children or the farm, and a divorce proceeding could drag on indefinitely. Her husband didn't want a divorce." The problem the state has is that the evidence failed to show *any* of that, except incidents of illegal sexual intercourse with Streat. The prosecution simply did not have the evidence. On the contrary, appellant's evidence by Mrs. King and her daughter that the shotgun blast was followed by the sound of a truck travelling *east,* completely contradicts the state's entire case.

Code Ann. § 38-109 requires that "to warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." The state's case failed to meet that standard, and accordingly the conviction must be reversed on the general grounds. It is unnecessary to consider the remaining enumerations of error.

*Judgment reversed. All the Justices concur, except Nichols, C. J., Jordan and Bowles, JJ., who concur in the judgment only.*

ARGUED JUNE 14, 1977 — DECIDED SEPTEMBER 7, 1977.

*Jones & Solomon, M. Theodore Solomon, II, Dupree & Staples, Hylton B. Dupree, Jr.,* for appellant.

*Dewey Hayes, District Attorney, Arthur K. Bolton, Attorney General, G. Stephen Parker, Assistant Attorney General,* for appellee.

JORDAN, Justice, concurring in the judgment only.

I concur in the judgment only and not in all that is said in the opinion. I certainly do not agree with the statement that illicit sexual intercourse of one's spouse with another is not a motive for murder.