NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the

# Supreme Court of Georgia

No. S26A0514
Timothy LaRue Sheffield
v.
The State

On Appeal from the  Superior Court of Coffee County
No. SUF2019000006

Decided: June 2, 2026

WARREN, Presiding Justice.

In October 2021, Timothy LaRue Sheffield was convicted of malice murder related to the shooting death of his wife of almost 30 years, Edith Sheffield.[1]  He appeals his conviction, arguing that the evidence was not sufficient to support his conviction and that his case should have been dismissed on the ground that his constitutional right to a speedy trial was violated.  We conclude that the evidence was sufficient to support Sheffield's conviction, but because the trial court erred in its analysis of Sheffield's speedy trial claim, we vacate the order denying Sheffield's motion

---

[1] Edith was killed in January 2013.  In October 2018, a Coffee County grand jury indicted Sheffield for malice murder.  At a jury trial in October 2021, the jury found Sheffield guilty.  Sheffield was sentenced to serve life in prison.  Sheffield timely filed a motion for new trial in November 2021 and amended it with new counsel in November 2023 and April 2024.  After evidentiary hearings, the trial court denied Sheffield's motion in July 2025.  Sheffield filed a timely notice of appeal to the Court of Appeals, which transferred the case to this Court.  The appeal was docketed to this Court's term beginning in December 2025 and submitted for a decision on the briefs.

to dismiss and remand the case for the trial court to properly address the speedy-trial claim.[2]

1. Viewed in the light most favorable to the verdict, the evidence presented at trial showed the following. At 6:04 p.m. on January 18, 2013, Edith, who was on her way home from work, called her cousin, and they spoke briefly. Based on Edith's location when she made the call, she would have arrived home by 6:19 or 6:20 p.m. The cousin called Edith back at 6:30 p.m.; Edith did not answer. At no later than 6:36 p.m., two people driving by Edith and Sheffield's house saw that the house was on fire. They stopped and called 911. When they went into the carport, they saw Edith's keys in the door that opened from the carport into the kitchen. They did not hear anyone in the house.

At the time of the fire, Edith and Sheffield's next-door neighbor, who was Sheffield's mother, and their "across the road" neighbors, who were Sheffield's sister and brother-in-law, were vacationing in Hawaii. However, two other neighbors, who lived two houses down from the Sheffields, saw the fire and came to the house. The neighbors looked into the back window of the house and could see "the entire bottom floor of the house." They did not see anyone or anything "out of place" or "messed up." Eventually, 25 to 30 people gathered at the house while the fire was burning; no one went inside the house.[3]

The first neighbor on the scene called Sheffield, who said

---

[2] Sheffield has raised several other claims on appeal that we do not consider. Sheffield may raise them again in a renewed appeal if the trial court rejects the speedy-trial claim on remand. See *Kitchens v. State*, 322 Ga. 169, 169 n.2 (2025).

[3] At least two men the neighbors did not know stopped after seeing the fire. And there were "multiple people in the woods behind the property" at the time of the fire.

he had been doing sheetrock work at the mobile home he and Edith had on their property, which was about 450 feet away from the house, connected by a dirt path through woods. The neighbor told Sheffield that his house was on fire, and "immediately" thereafter, Sheffield "rolled out of the woods," driving his truck "real slow." Sheffield then got out, "knelt down" or "leaned on the hood" of the truck, and "lit a cigarette." Sheffield did not ask about Edith upon his arrival.

The gathered witnesses asked Sheffield where Edith was, and he said he did not know. They told Sheffield to call Edith. Sheffield "turned his back" to the group of neighbors, walked "four or five feet" away, and made a call. Although one of the neighbors heard him "mumbl[ing]" on the phone, when he hung up and the group asked what Edith said, Sheffield said that Edith did not answer and he did not know where she was. Sheffield did not say anything more but continued to stand by his truck. After emergency services arrived, Sheffield was taken into the back of the ambulance and treated for "extremely high blood pressure," which the treating doctor said could be caused by "extreme stress" or "emotional pain."

The fire in the house caused the second floor to collapse onto the first floor.[4] Once firefighters got the fire under control and were able to enter the house, they began to search the debris, which was "a foot to eighteen inches" deep. During the search, Sheffield asked a GBI agent about "[a] jewelry box located in the residence, a fireproof gun safe that was in the residence, and a

---

[4] The fire chief could not determine if an accelerant was used to set the fire, but he explained that the fire "consumed more in the time frame" than ordinarily would be expected, which is evidence of an accelerant "the majority of the time." Sheffield and Edith kept a gas can in the carport for their lawn mower.

3

jug … of coins," wanting "to see if anything had been moved or taken." Sheffield did not ask the agent about Edith. The day after the fire, Edith's burned body was found in the carport.[5] Edith was still wearing her jewelry—a necklace, earrings, and three rings—and her purse—with $1463.71 inside—was found under her body. Edith had "four pieces of … plastic straws," the kind used "for soft drinks and things of that sort," "grasped" in her left hand.

A later autopsy showed that Edith had been shot three times by a 12-gauge shotgun: once in her hand, arm, and the front of her chest at a "more distant-range" and twice at "close range" in the back of her head and neck. The head shots "would have caused her to die immediately." Based on the lack of smoke in her lungs, the medical examiner determined that Edith died before being burned in the fire. The burned "barrel" and "receiver" of a 12-gauge shotgun were found in the debris in "the general area" between the kitchen and the living room. Edith and Sheffield kept a shotgun in their bedroom.[6]

After almost six years of investigation, law enforcement officers arrested Sheffield for Edith's murder in December 2018. During his trial, evidence was presented that at some point between the summer of 2008 and the summer of 2009, Sheffield had an extra-marital affair with Amy Stephens. Stephens testified

---

[5] The two witnesses who had been in the carport at the beginning of the fire had not seen a body.

[6] Because the recovered shotgun was so badly damaged, it could not be determined through testing if it was the murder weapon or was the Sheffields' shotgun. No other shotgun was found in the debris in the house. Sheffield told a GBI investigator that he kept a .32-caliber weapon in his nightstand; this gun was not found. Other guns were kept in a gun safe in the Sheffields' son's room. According to the Sheffields' son, after the fire, the safe was located "about six to eight feet from where it should have been."

that their sexual relationship happened "one time" and was "a mistake," but after that, she and Sheffield remained good friends. Although she moved away from Georgia in the summer of 2009, she remained in contact with Sheffield, calling him for help with a "car problem" or "a project or something like that." Sheffield sent Stephens money on a "few occasions," including $500 one time. Sheffield and Stephens would tell each other they loved each other, and "at times" Stephens "got the feeling" that Sheffield wanted a romantic relationship with her, but she "would just always reassure him … this was a friendship." Sometime during 2009 or 2010, after she had moved away from Georgia, Sheffield "requested" that Stephens send him photographs that were "sexual in nature" for his birthday. Stephens "reluctantly sent them."[7]

Before Edith's death, Sheffield would talk to Stephens "about his marriage," and at some point, Sheffield told Stephens that he and Edith "had talked about" getting a divorce; that Edith did not "believe[] in" divorce; and that he was "afraid" that if he got a divorce, Edith would "take everything." The week before Edith's death on January 18, Sheffield and Stephens exchanged two phone calls, speaking for 14 minutes on January 14 and 8 minutes on January 16. Stephens testified that she did not remember the topic of those phone calls.

After Edith's death, Stephens saw Sheffield on two occasions, both "probably" in 2014. On one occasion, Stephens stopped in Georgia on her way to her daughter's home in Alabama. In

---

[7] These photographs were recovered from a cell phone that was found in Sheffield's truck and admitted into evidence. The parties stipulated that Sheffield had not used this phone since September 2011 and at that point had transferred his number to a different phone.

Georgia, Sheffield went with Stephens to her high school reunion and then they traveled together to Alabama to work on her daughter's house. They worked on the house for about two days, but they did not sleep together. On another occasion, Sheffield, who bought a Mustang convertible in 2014, drove the car to Colorado, where Stephens was living at the time. He did not stay with her, but he visited and gave Stephens a ring he bought for her on his recent vacation to the Caribbean, and he gave her son a rifle scope.[8] Additionally, at some point after Stephens moved to Colorado in 2010, Sheffield asked Stephens, "What if I move out there, could we do a business together, would you move in with me? Would you be interested?" Stephens answered, "No, of course not."

At trial, the State argued that Sheffield killed Edith so he could be with Stephens because, although Stephens thought the sexual relationship between her and Sheffield was over, to Sheffield, Stephens was "the trophy person he wanted to build a life with" and their continued communication made Sheffield "think he had a chance." For his part, Sheffield argued that the murder was the result of Edith surprising burglars, contending that the burglars did not steal Edith's jewelry and purse because they "got out of there as quickly as they c[ould]" after shooting her and setting the fire to cover it up.[9] The jury found Sheffield guilty of malice murder.

1. Sheffield contends that the evidence presented at trial was not sufficient to support his conviction for malice murder as a matter of constitutional due process and Georgia statutory law.

---

[8] Sheffield went to the Caribbean with Edith and their friends "several times" before Edith's death, and he went once after Edith's death.

[9] Sheffield also pointed to evidence that the .32-caliber gun was never found and that the gun safe was moved as evidence of a burglary.

See *Jackson v. Virginia*, 443 US 307, 319 (1979); OCGA § 24-14-6. When reviewing these claims, we view the evidence presented in the light most favorable to the verdict. See *Jackson*, 443 US at 319; *Montgomery v. State*, 323 Ga. 188, 190–91 (2025).

(a) In considering Sheffield's claim based on constitutional due process, we "ask whether a rational trier of fact" could have found him guilty beyond a reasonable doubt of malice murder, and we leave "[q]uestions about the weight and credibility of evidence, the inferences to be drawn from it, and the resolution of any conflicts in the evidence" to the jury. *Profet v. State*, 322 Ga. 731, 737 (2025).

Here, the evidence, when viewed in the light most favorable to the verdict, showed that Sheffield was near the crime scene at the time of the murder. By Sheffield's own account, he was a mere 450 feet away from the house where Edith was shot, and witness testimony indicated that he may have been even closer than he admitted because although he was allegedly in the mobile home 450 feet away when he was called to the fire and was driving "real slow" when he arrived, he arrived at the scene "immediately." Sheffield knew where he and Edith kept a shotgun in the house, and the murder weapon was a shotgun. The jury could have reasonably inferred that the shotgun found in the house was both the murder weapon and the gun owned by the Sheffields.

Also, the jury could have inferred from the testimony about Sheffield's reaction when he saw the fire that he was not concerned about Edith. He did not attempt to approach the house, instead smoking a cigarette by his truck, and he did not ask about Edith. He called Edith only after witnesses told him to, and he acted suspiciously when calling her, turning away from the group and eventually reporting that he did not know where Edith was but making no further efforts to locate her. Even when the house

7

was being searched, Sheffield did not ask about Edith, voicing concern instead about possessions that were in the house. And the jury could have inferred that Sheffield chose this day to murder Edith because his closest neighbors, who were also his family, were out of the state.

The jury also could have concluded that Sheffield was motivated to kill Edith because he wanted a relationship with Stephens. Although Stephens testified that her affair with Sheffield was short-lived, there was evidence from which the jury could infer that Sheffield maintained romantic feelings toward Sheffield and wanted a closer relationship. Specifically, Sheffield remained in contact with Stephens after she moved away from Georgia, including talking to her on the phone twice during the week of the crimes; Sheffield requested, and Stephens sent him, pictures of a sexual nature; Sheffield asked Stephens if he could move in with her; and Sheffield drove to Colorado to visit Stephens and give her a gift after Edith's death. Also, Stephens testified that Sheffield had told her Edith did not "believe[] in" divorce and that he was "afraid" Edith would "take everything" if he got a divorce.

In light of the inferences the jury was permitted to draw from this circumstantial evidence presented at trial, we conclude that the evidence was sufficient to support Sheffield's malice murder conviction as a matter of constitutional due process. See, e.g., *Smith v. State*, S26A0140, 2026 WL 1072767, at *3 (Ga. Apr. 21, 2026) (holding that the evidence supporting the appellant's convictions was constitutionally sufficient where the appellant had a motive to shoot the victim and was near the area of the crimes at the time of the crimes, and gunshot residue was found on clothing the appellant had been seen wearing on the day of the shooting); *Merritt v. State*, 323 Ga. 23, 27 (2025) (holding that the evidence

8

was constitutionally sufficient to support the appellant's convictions where the evidence showed that he was present at the scene of the crimes, he had a motive to kill the victim, and after the crimes he fled the state and went into hiding); *Brown v. State*, 301 Ga. 728, 731 (2017) (holding that the evidence was constitutionally sufficient to support the appellant's convictions where the evidence supported a finding that the appellant was at the crime scene at the time of the death, she had a motive to kill the victim, she "attempted to have persons other than the police check on" the victim, and "she appeared to know specific information about the death before the police knew it"); *Barnes v. State*, 245 Ga. 609, 609 (1980) (holding that the evidence was constitutionally sufficient to support the appellant's convictions where the appellant had a motive for the shooting, testimony "placed the appellant in the general area of the crime at approximately the time of its occurrence," the appellant "had easy access to the trailer where the murder weapon had been kept," and the appellant was seen with the weapon 10 minutes before the shooting occurred).

(b) Georgia law requires that when a conviction is based entirely on circumstantial evidence, as it was here, the State must present sufficient evidence to "exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. "Whether an alternative hypothesis is reasonable, and whether the circumstantial evidence excludes any such hypotheses, are questions for the jury, and we will not disturb the jury's findings unless they are insupportable as a matter of law." *Profet*, 322 Ga. at 737 (quotation marks omitted).

(i) Sheffield argues that the evidence was not sufficient to exclude the hypothesis that Edith was killed by one of the other people near the scene at the time of the fire and that Edith was killed because she interrupted a burglary in progress. However,

9

the evidence presented at trial supported the jury's rejection of this hypothesis.

As discussed above, the evidence supported a finding that Sheffield was near his house at the time of the crime and was motivated to kill Edith so he could be with Stephens. Although there was some evidence that other people were near the Sheffields' house around the time of the murder, there was no evidence that any of those people had any motive to kill Edith. The only motive Sheffield postulated was that an unknown assailant was committing a burglary. The burglary theory, however, was undermined by the witnesses' testimony that nothing seemed "out of place" or "messed up" when they looked in the house and the fact that Edith's jewelry and purse (with more than one thousand dollars inside) were found with her body. Moreover, the jury could have inferred that the murder weapon was the shotgun the Sheffields owned rather than a different one brought to the scene by a would-be burglar, and jurors could have rejected as unreasonable the hypothesis that a burglar located and then used the shotgun the Sheffields kept in their bedroom after Edith surprised the perpetrator mid-burglary. Thus, the evidence was sufficient for the jury to reject as unreasonable the hypothesis that an unknown person killed Edith during a burglary gone wrong. See *Smith*, S26A0140, 2026 WL 1072767, at *4 ("[T]he jury could have concluded that it would be unreasonable to think that someone else shot [the victim] with no apparent motive, without leaving any trace of their presence, at the same time that [the appellant]— who *did* have a motive—was at the scene of the shooting[.]"); *Merritt*, 323 Ga. at 27 (concluding that the jury was authorized to reject as unreasonable the appellant's hypothesis that unknown men broke into the victim's house and killed her, where "the evidence showed that there were no signs of struggle in [the victim's] house and [the appellant's] story required the jury to believe that

although the men brought guns to the house, they used household items to kill [the victim]").

(ii)  Sheffield also argues that we must reverse his conviction based on *Carter v. State*, 239 Ga. 509 (1977), in which this Court held that the circumstantial evidence presented in that case was not sufficient to support the appellant's convictions under the former, substantially similar, version of OCGA § 24-14-6. Even assuming *Carter* was correctly decided, it is distinguishable from this case and does not mandate that we reverse Sheffield's conviction.

Similar to this case, the victim and appellant in *Carter* were married, the murder weapon might have been a shotgun the couple owned, the appellant was close to the crime scene and had the opportunity to commit the murder, the appellant seemed unconcerned upon finding the victim after he had been shot, and the victim's watch, wallet, and money were found with the body.  See *Carter*, 239 Ga. at 509–11.  And in both cases, there was evidence that the appellant had an affair that ended before the murder.  In *Carter*, the appellant's paramour testified that the affair ended three to four weeks before the murder, and another witness testified that the appellant "begged" her paramour to meet her "about two weeks before the murder."  Id. at 511–12.

But there are important differences between the evidence presented in *Carter* and the evidence presented in this case.  Stephens's testimony that she maintained contact with Sheffield—including sharing two phone calls the week of the murder—is evidence that Stephens and Sheffield were in contact mere days before the crimes, whereas the appellant and her paramour in *Carter* were last in contact two weeks before the murder in that case.  Also, there was no evidence in *Carter* that the appellant and her paramour continued to have contact after the murder,

11

whereas the evidence in this case showed that Sheffield spent time with Stephens in Alabama and Georgia and drove to Colorado to visit Stephens after Edith's death. Finally, we emphasized in our analysis in *Carter* that the evidence of the appellant's motive was particularly weak because there was no evidence "that appellant wanted a divorce" or that her husband "refused her a divorce." Id. at 515. Here, by contrast, Stephens testified that Sheffield "had talked about" divorce and said Edith did not "believe[] in" divorce and that he was "afraid" Edith would "take everything" if he got a divorce. Thus, the evidence of Sheffield's motive was different and stronger than the evidence in *Carter*; *Carter* is distinguishable; and *Carter* does not require that we reverse Sheffield's conviction.

(iii) Based on the above analysis, we reject Sheffield's argument that the evidence presented at trial was not sufficient to support his malice murder conviction under OCGA § 24-24-6.

2. Sheffield next asserts that the trial court abused its discretion when it concluded that his right to a speedy trial had not been violated and denied his motion to dismiss. Sheffield was arrested on December 21, 2018. His trial began slightly over 34 months later, on October 25, 2021. Sheffield remained incarcerated throughout that time. After his first motion for bond was denied, he filed a motion for reconsideration of bond. At the September 18, 2019 hearing on that motion, the trial court asked the State what it was "waiting on to get this case tried," and the State answered, "Just the order of the cases," explaining that there were "other murder cases that have been pending longer." The court again denied Sheffield's bond request but said, "[T]his case just needs to be scheduled and tried."

On October 21, 2021 (one day before a scheduled hearing on pretrial motions and four days before trial started), Sheffield

12

filed a motion to dismiss on the ground that his constitutional right to a speedy trial had been violated. No hearing was held on the motion, and no written order was issued on the motion before trial. However, at the hearing on Sheffield's motion for new trial, the trial court concluded that it had verbally denied the motion to dismiss, but not on the record.[10] The court then issued a written order denying Sheffield's motion to dismiss, dating it nunc pro tunc to October 25, 2021.

(a) *Legal Framework*

In ruling on a constitutional speedy trial claim, a trial court must first consider "whether the interval from the accused's arrest, indictment, or other formal accusation to the trial is sufficiently long to be considered presumptively prejudicial." *Henderson v. State*, 310 Ga. 231, 234–35 (2020) (quotation marks omitted).

> If the delay is long enough to invoke the presumption of prejudice, the trial court must balance four factors: (1) whether the delay before trial was uncommonly long, (2) whether the government or the criminal defendant is more to blame for the delay, (3) whether, in due course, the defendant asserted his right to a speedy trial, and (4) whether he suffered prejudice as the delay's result.

Id. (cleaned up). See also *Barker v. Wingo*, 407 US 514, 530

---

[10] The motion to dismiss was discussed at the motion for new trial hearing because Sheffield argued in his motion for new trial that the trial court should have granted Sheffield's motion to dismiss and that his counsel provided ineffective assistance by "elect[ing] to have the Court rule on the motion [to dismiss] without evidence."

(1972); *Doggett v. United States*, 505 US 647, 652 (1992).

The application of the *Barker* test is committed to the sound discretion of the trial courts, so this Court "accepts the trial court's factual findings unless they are clearly erroneous," and reviews "the trial court's evaluation of each factor and its balancing of the factors—its ultimate judgment—only for abuse of discretion." *Nelson v. State*, 321 Ga. 460, 463 (2025). "[I]t is imperative that the trial court enter findings of fact and conclusions of law consistent with *Barker*," and "it is not the role of an appellate court to weigh the *Barker* factors in the first instance." *Kitchens v. State*, 322 Ga. 169, 178 (2025).

> If the trial court's factual findings are clearly erroneous or the trial court significantly misapplies the law, we will affirm the trial court's exercise of discretion only if we can conclude that, had the trial court used the correct factual and legal analysis, it would have had no discretion to reach a different judgment. If the trial court would still have discretion to reach a different judgment, we remand for the trial court to reweigh the factors and exercise its discretion using the correct factual and legal analysis.

*Nelson*, 321 Ga. at 463 (cleaned up).

(b) *The Trial Court's Order*

In the order denying Sheffield's motion to dismiss, the trial court first noted that Sheffield was arrested on December 21, 2018, was indicted on January 30, 2019, waived arraignment on February 4, 2019, filed his motion to dismiss on October 21, 2021, and was tried beginning on October 25, 2021. The court then

14

stated that "[t]he delay of over 34 months is a presumptively prejudicial delay requiring the four-factor analysis of *Barker v. Wingo*."

(i) As to the first factor, which the court recognized is "the length of the delay," the trial court held only: "'The presumptive prejudice arising from delay cannot alone carry a Sixth Amendment claim without regard to the other *Barker* criteria. Instead, it is part of the mix of relevant facts, and its importance increases with the length of delay.'" (quoting *State v. Sutton*, 273 Ga. App. 84, 86 (2005)).

(ii) As to the second factor—the reason for the delay—the trial court held that it "weighs neither for or against the State." The court first noted that there were several status conferences held on the case after Sheffield was arrested, including three in 2019, three in 2020, and one in 2021. The court then found that "[j]ury trials were prohibited by Emergency Orders of the Supreme Court of Georgia" from March 14, 2020 to October 10, 2020 and from December 23, 2020 to March 9, 2021.[11] The court found that during the brief period when jury trials were allowed between October 2020 and December 2020, "the court attempted a

---

[11] On March 14, 2020, the Chief Justice of the Supreme Court of Georgia issued an order declaring a Statewide Judicial Emergency due to the Covid-19 pandemic. The order instructed courts to "remain open to address essential functions" "[t]o the extent feasible" and stated that jury trials that had already begun should "continue to conclusion, unless good cause exists to suspend the trial or declare a mistrial." The order set the state of emergency to terminate on April 13, 2020, unless extended. Later orders extended the Statewide Judicial Emergency until June 30, 2021. During this time, jury trials were expressly prohibited by order from May 11, 2020, to October 10, 2020, and from December 23, 2020, to March 9, 2021. See https://www.gasupreme.us/court-information/court_corona_info/.

15

jury trial in another case, but a mistrial occurred because of penetration of Covid-19 infection into the Coffee County District Attorney's Office."[12]  The court found that "[o]nce jury trials resumed in May, 2021, there was a considerable backlog of cases to work through" and that "courtroom space was limited" because the Coffee County Courthouse "was undergoing extensive renovations during the second half of 2021."

The court found that Sheffield's case "was tried less than six months after jury trials became practicable" and concluded that the trial was held "as soon as was practicable given the public health emergency, ensuing backlog, and available facilities."  The court held that the "State was not responsible for the delays occasioned by the Covid-19 pandemic" and ultimately concluded: "The length of the delay in this case, given the above timeline, public health emergency, and related complications is not attributable to either the State or Defendant."[13]

(iii)  As to the third factor, the court found that Sheffield "did not at any point assert his Constitutional right to a speedy trial until the evening of October 21, 2021, which was the day before the hearing on pretrial motions," so the court weighed this

---

[12] The trial court order says that this other trial began on December 7, 2019, and a mistrial was declared on December 9, 2019.  The 2019 in both dates appears to be a scrivener's error because the record strongly suggests that the trial at issue began in 2020.  Specifically, the rest of the paragraph discussing the timing of this trial implies that it happened between October 10, 2020, and December 23, 2020, and the timeline submitted into evidence by the State at the motion for new trial hearing states that this trial was held from December 7 to December 9, 2020.

[13] As noted in footnote 16 below, Sheffield does not challenge the trial court's decision not to weigh the delays attributable to the Covid-19 emergency orders against either party, so we do not decide whether that conclusion was correct.  As discussed further below, however, we conclude that the trial court made other errors in its analysis of this factor.

16

factor "heavily against" Sheffield.

(iv)  As to prejudice from the delay, the court found "no evidence of oppressive pretrial incarceration," concluding that because Sheffield did not present any evidence in support of his motion to dismiss, there was no evidence "regarding anxiety and concern of the accused" or of any "hypothetical witnesses whose memories waned with time" or "physical evidence no longer able to be obtained."  Thus, the court found "no prejudice" to Sheffield "as a result of the delay" and held that "this factor does not weigh in favor of dismissal."

(v)  In conclusion, the court stated:

> The Court finds that, while there is a presumptively prejudicial delay of between 24 to 34 months, that presumption was overcome as the factors taken as a whole, weigh against the Defendant, particularly in light of the reason for the delay, Defendant's lengthy delay in asserting his right to a speedy trial, and the absence of any prejudice to his defense.

The court then denied Sheffield's motion to dismiss.

(c)  *Analysis*

For the reasons discussed below, we conclude that the trial court significantly misapplied the law as to the first two factors of the *Barker* test, and we vacate the trial court's order denying Sheffield's motion to dismiss and remand for the trial court to properly weigh those factors in the first instance.

(i)  To address the first factor, trial courts must calculate the length of the delay, which begins at "the time of arrest or formal accusation or indictment, whichever occurs first," and "runs until the date on which the defendant's trial begins." *Henderson*,

17

310 Ga. at 235. A delay of 12 months or more is generally presumed to be prejudicial. Id. at 236.

There is ambiguity in the trial court's order as to its determination of the length of the delay here. As laid out above, in the order, the trial court initially identified the relevant dates and then correctly stated that a delay of 34 months is presumptively prejudicial. However, when the trial court balanced the *Barker* factors in its conclusion, the trial court "f[ound] that … there is a presumptively prejudicial delay of between 24 to 34 months." Thus, it is not clear if the trial court found that the length of the delay was 24 months, 34 months, or some amount of time between 24 and 34 months.[14] This failure "to expressly calculate the length of the delay" is a "significant misapplication[] of the law." *Kitchens v. State*, 322 Ga. 169, 171 (2025) (holding that the trial court significantly misapplied the law when, "in reviewing the length of the delay," the court noted when Kitchens was arrested, indicted, reindicted, and tried, and said "the time span of this delay was presumptively prejudicial," but failed to "expressly calculate the length of the delay").

Clearly determining the length of the delay is important for the first *Barker* factor because in weighing this factor, the trial court must consider whether the delay before trial was uncommonly long and should assign weight to this factor. See *Nelson*, 321 Ga. at 464. Here, however, the trial court failed to weigh the length of the delay as part of its consideration of the first *Barker*

---

[14] The reason for the ten-month discrepancy is not clear from the face of the order. We observe that the amount of time the trial court found that jury trials were prohibited was about nine and a half months, so the trial court may have been deducting that time from its ultimate calculation of the delay. If so, that would be a legal error. See *Henderson*, 310 Ga. at 235 (explaining that once the right to a speedy trial attaches, the "time then runs until the date on which the defendant's trial begins").

factor. Instead, the court conflated the threshold "presumption-of-prejudice inquiry" and the "length-of-the-delay factor" and concluded only that the length of the delay was "presumptively prejudicial"; in doing so, the court "significantly misapplied the law." See *Nelson v. State*, 321 Ga. 460, 464 (2025). Notably, in cases where the trial court has correctly considered this length-of-the-delay factor, we have held that the court did not abuse its discretion by holding that a 30-month delay weighed to some extent against the State. See, e.g., *Leonard v. State*, 316 Ga. 827, 839 (2023) ("[T]he trial court was correct to weigh the length of the delay [of 30 months] against the State."); *Davis v. State*, 315 Ga. 252, 256 (2022) (identifying no abuse of discretion in the trial court's conclusion that a 30-month delay weighed "lightly" against the State).

(ii) As to the reason-for-the-delay factor, "the trial court must consider which party was responsible for the delay, whether the delay was intentional, and, if it was intentional, what the motive was for seeking or causing the delay." *Nelson*, 321 Ga. at 465 (quotation marks omitted). The trial court may assign different weights for different reasons; for example "an unintentional delay," such as one caused by "the trial court's overcrowded docket, should be weighted less heavily against the government." Id. (cleaned up).

As explained above, when considering this factor, the trial court focused on the Covid-19 emergency orders, concluded that the State was not responsible for delays caused by Covid-19, and weighed the factor neutrally, neither for or against either party.[15]

---

[15] Although, in the section of the trial court's order discussing the reason-for-the-delay factor, the trial court concluded that this factor should be weighed neutrally, when balancing the factors in the conclusion, the trial court

In so doing, the trial court misapplied the law because it failed to consider who was responsible for the parts of the delay that were not attributed to the Covid-19-related emergency orders and failed to weigh the factor accordingly.[16]

Based on the trial court's findings about when the Covid-19-related prohibition on jury trials began, Sheffield was incarcerated for about 14 months (from December 21, 2018, to March 14, 2020) before jury trials were first prohibited; about two months when jury trials were briefly permitted from October 10, 2020, to December 23, 2020; and over seven months after jury trials were allowed to resume (March 9, 2021, to October 25, 2021).

stated: "the factors taken as a whole, weigh against the defendant, particularly in light of the reason for the delay, Defendant's lengthy delay in asserting his right to a speedy trial, and the absence of any prejudice to his defense." Because the trial court listed all three factors after concluding that the factors "as a whole, weigh against the defendant," this sentence could be read as concluding that all of the factors weighed against Sheffield, even though the trial court did not make any findings that Sheffield contributed to the reason for the delay. In our analysis, we will assume that the trial court's clearer conclusion—that the reason-for-the-delay factor did not weigh against either party—was what the trial court considered in balancing the factors in its ultimate conclusion. However, we note that, in light of a lack of any findings that Sheffield contributed to the delay, the court would have abused its discretion by weighing the reason-for-the-delay factor against Sheffield. See *Nelson*, 321 Ga. at 465–66 (holding that the trial court should not have attributed part of the delay to the defendant where the court's factual finding that the trial was delayed due to defense counsel's requests was clearly erroneous).

[16] Sheffield argues only that the trial court abused its discretion by failing to consider the delays that were not attributed to Covid-19-related court closures. He has never argued that the delays attributable to the Covid-19 emergency orders should be weighed against the State, so we do not decide that question today. See *Nelson*, 321 Ga. at 465 n.4 (declining to decide whether the Court of Appeals cases that have held that delays caused by Covid-19 should not be weighed against either party are correct because the appellant conceded that point below and did not raise it on appeal).

As to the 14-month delay, the trial court noted that some status conferences were held on the case during this time, but the court failed to make any findings as to the cause of that lengthy delay. As noted above, there was some discussion about the pretrial delay at the September 2019 bond reconsideration hearing, and the State said it was waiting to try Sheffield's case because "other murder cases [had] been pending longer." As to the two months at the end of 2020 when jury trials were allowed, the court found that the State elected to try a different case and then there was a "penetration of Covid-19 infection" in the District Attorney's office. As to the final seven-month delay after jury trials were again allowed to resume, the trial court found that "there was a considerable backlog of cases" and "courtroom space was limited" due to renovations.

Delays caused by selection of cases, a backlog of cases, and limited courtroom space are attributable to the State. See, e.g., *Nelson*, 321 Ga. at 465 (explaining that a delay caused by "the trial court's overcrowded docket" should be weighed against the State, although not heavily); *Redding v. State*, 318 Ga. 225, 229 (2024) (holding that the reason-for-the-delay factor "should be weighed against the State" where the 25-month delay was attributed "to the need for the State to collect evidence" and "for the court to provide timely trials to other cases"). However, the trial court failed to attribute any of the delay to the State. Thus, the trial court significantly misapplied the law as to this factor by failing to determine who was responsible for the delay not attributed to the Covid-19 emergency orders and failing to weigh the factor accordingly. See *Redding v. State*, 313 Ga. 730, 733 (2022) (holding that the trial court improperly "failed to weigh" the reason-for-the-delay factor where it "failed to address the amount of time involved in each delay" that was part of the pretrial period and failed to attribute it to the appellant or the State).

(iii) As to the assertion-of-the-right factor, the trial court did not abuse its discretion by weighing this factor heavily against Sheffield because Sheffield waited 34 months (from his arrest on December 21, 2018, until October 21, 2021) to assert his right to a speedy trial. See *Rucker v. State*, 315 Ga. 568, 581 (2023) (concluding that the trial court "acted within its discretion in weighing this factor heavily against" the defendant, where the defendant "waited 17 months to file his constitutional speedy trial motion"); *Davis v. State*, 315 Ga. 252, 258 (2022) (concluding that it was not an abuse of discretion to conclude that the defendant's failure to file a timely statutory speedy trial motion and the "29-month delay in asserting his constitutional speedy-trial right[] weighed heavily against him").

(iv) As to the prejudice factor, "[t]he prejudice associated with unreasonable delay before trial includes oppressive pretrial incarceration, anxiety and concern of the accused, and the possibility that the accused's defense will be impaired by dimming memories and loss of exculpatory evidence." *Henderson*, 310 Ga. at 239 (cleaned up). Here, at the time the trial court considered his motion to dismiss, Sheffield did not present any evidence that his pretrial incarceration was oppressive, caused him anxiety, or hindered his defense, and the trial court did not clearly err by finding no other evidence of prejudice. Thus, the trial court did not abuse its discretion by not weighing this factor in Sheffield's favor. See id.[17]

---

[17] At the motion for new trial hearing, Sheffield testified that during his pretrial incarceration, he experienced "a lot of stress and anxiety … from not being able to see the family"; that his anxiety medication had to be increased; that he "had to sell off a lot of assets to help pay for stuff"; that the "lack of sunshine" caused him to lose many of his teeth; and that he was not

(v) In sum, we have concluded that the trial court misapplied the law when considering the first two *Barker* factors by failing to clearly calculate the length of the delay, failing to weigh the length-of-the-delay factor, and failing to attribute responsibility for the period of the delay not related to the Covid-19 emergency orders. We cannot conclude that if the trial court had weighed these two factors appropriately, it "necessarily would have ruled that there was no violation of the constitutional right to a speedy trial." *Kitchens*, 322 Ga. at 178. We therefore vacate the trial court's denial of Sheffield's motion to dismiss on constitutional speedy-trial grounds and remand for further consideration of the motion. See id. See also *Nelson*, 321 Ga. at 469 (vacating the trial court's order denying the appellant's motion to dismiss on constitutional speedy trial grounds "[b]ecause the trial court would not have been compelled to deny Appellant's motion to dismiss if it had used the correct factual and legal analysis").

*Judgment vacated and case remanded. All the Justices concur.*

---

able to meet with his attorney as often as he wanted. In his reply brief to this Court, Sheffield argues that the trial court should have considered this testimony in ruling on his motion to dismiss (even though the order was dated nunc pro tunc to a date before this evidence was presented). Even assuming the trial court should have considered Sheffield's testimony, it did not abuse its discretion by declining to weigh the prejudice factor in Sheffield's favor because even considering that testimony, Sheffield did not present evidence of oppressive pretrial incarceration or anxiety that was "unusual or extraordinary for a criminal defendant awaiting trial." *Henderson*, 310 Ga. at 239 ("Because the trial court did not clearly err in finding that Henderson's anxiety was not unusual or extraordinary for a criminal defendant awaiting trial, we see no abuse of discretion in its determination that Henderson was not prejudiced in this regard.").